**UNITED STATES of America, Plaintiff,**

v.

**Mark Brian STEVENS, Defendant.**

**No. G85–134 CR.**

United States District Court,
W.D. Michigan, S.D.

May 27, 1986.

John A. Smietanka, U.S. Atty., for W.D. Mich. by Richard S. Murray, Asst. U.S. Atty., Grand Rapids, Mich., for plaintiff.

Paul Mitchell, Grand Rapids, Mich., for defendant.

## OPINION

BENJAMIN F. GIBSON, District Judge.

In this criminal case, defendant is charged with six counts of making false and fictitious statements in connection with the acquisition of firearms, six counts of receiving firearms as a convicted felon, two counts of possession of a firearm as a convicted felon, one count of unlawful transportation of firearms, and two counts of possession of an unregistered firearm. Now before the Court are two motions to suppress certain evidence obtained through allegedly invalid searches. Having held an evidentiary hearing on this matter, the Court finds the relevant facts as set forth below.

## FINDINGS OF FACT

In June, 1985, two special agents for the Bureau of Alcohol, Tobacco, and Firearms ("ATF") named Roger Guthrie and James Stubbs attended a "mercenary" training camp held in Kent County, Michigan. While posed undercover as a student at the camp, Guthrie met Mark Stevens, a quasi instructor, and his friend Lawrence Flory. Guthrie befriended Stevens and observed what he felt was the illegal possession of certain firearms.

After the camp, Guthrie spoke with Stevens and Flory about attending another such school which was forthcoming in Alabama in November. Guthrie expressed an interest, and it was agreed that he would travel from Detroit to Grand Rapids to meet Flory and Stevens and another individual in order to depart together enroute to Alabama. Guthrie arrived in Grand Rapids on November 14 and after establishing contact with the ATF office, he proceeded to Stevens' home. Upon his arrival, Guthrie was met by Stevens and his girlfriend, Suzanne Gay, at which time he was invited into the kitchen and living room of the home.

Agent Guthrie testified that as he entered the room, he saw two firearms in plain view on either side of the fireplace. He further explained that, upon entering

the room, he could see into the kitchen where he noted a gun case and a pile of Army equipment which was packed and ready to go. Guthrie further testified that after a brief conversation, Stevens invited him upstairs in order to show him something. He claims that they proceeded into an upstairs bedroom which was filled with various firearms, including an M–60 machine gun which was propped up on a table. Guthrie claims that they examined the M–60 and discussed its various uses. Ms. Gay, however, testified that there were no guns present in the living room that evening and that the normal procedure was to keep the guns in the upstairs bedroom. Ms. Gay further testified that Guthrie did not go upstairs that evening.

The Court resolves these conflicts in the evidence in favor of the plaintiff. The Court notes a contradiction in the testimony of Ms. Gay in that she stated that Mr. Stevens never left guns in rooms other than the designated bedroom; however, she admitted that guns had been left out on previous occasions and that she had put them away during house cleaning. The testimony of Agent Gates also tends to show that guns had been left about the house on occasions. Agent Gates testified that guns were in plain view in the living room when he entered the home the following evening. The Court is of the opinion that Ms. Gay's recollection of the placement of the guns is based more on common practice rather than on a memory of the evening's events. The Court therefore finds Agent Guthrie's statements more credible in this regard. The Court is also of the opinion that Guthrie was invited into the upstairs bedroom on the evening of Nov. 14. Guthrie testified that he, Flory, and Stevens had previously discussed their common interest in the M–60, along with the fact that Stevens had purchased one at a Soldier of Fortune Convention out west. Guthrie's statements concerning the purchase of the gun was confirmed as correct by the testimony of Ms. Gay. It is not unreasonable to conclude that the M–60 was one of Stevens' favorite acquisitions, as is evidenced by the prominent manner in which it was displayed, and that based on the previous discussion, he would likely want to show it to Guthrie. The Court discredits the testimony of Ms. Gay partially due to the nature of her relationship to the defendant and partially based on her apparent inattentiveness to the evening's events, as evidenced by her belief that the men left the house to go shine deer when in reality they intended to go to a bar and did.

After examining the guns, the men left the house and went to a bar where they met another individual, Jim McCune. While there, Guthrie contacted Flory, who indicated that he was sleepy and not interested in having company. At this time, Stevens invited Guthrie to stay the evening at his home. It was approximately 2 a.m. Stevens and Guthrie returned to Stevens' home, but left again to go shine deer.

The men returned home in approximately one hour, at which time Guthrie proceeded to his bedroom which was on the second floor near the room where the weapons were stored. The defendant claims that, during the morning hours of Nov. 15 while the occupants of the home were asleep or after they departed, Guthrie searched the home and found weapons. The plaintiff contends that no such search took place. Guthrie testified that he slept until 10 a.m., at which time he arose and went downstairs to the living room and watched a video tape while awaiting Mr. Stevens. He further testified that Stevens emerged from the basement about an hour later. Ms. Gay testified that Guthrie was sound asleep at 7 a.m. when she entered his room and that he was alone in the home after 7:30 a.m. when she left for work, as Stevens had gone hunting. Having concluded that the guns were in plain view to Guthrie on the previous evening and absent any testimony which tends to contradict Guthrie, the Court resolves this discrepancy in favor of the plaintiff.

After Stevens appeared, the two men left the house. Stevens went to the gym, while Guthrie contacted his office with information which would be used to obtain a search warrant for the house. When Guthrie re-

turned to the house, Stevens was already present and the two men began to prepare for the trip.

Around five o'clock, Flory arrived at Stevens' home and they began to pack Flory's car. Stevens packed a green Rucksack, a blue suitcase, web gear and a long gun case. During a previous conversation, Stevens had informed Guthrie that he was taking a riot shotgun, and a .22 caliber pistol. After loading these items, Flory went to his residence to pack his gear. Flory had previously informed Guthrie that he had an Army knapsack full of explosive devices which were similar to those used at the June training camp. When Flory returned, Guthrie went to the car to get a heavier coat, at which time he observed the fully packed trunk. Guthrie noticed the Army knapsack and the end of an explosive device inside.

The men departed around 5:30, making several stops before reaching the highway. Guthrie was wired with a microphone and during one of the stops he transmitted, to the surveillance team, information concerning the firearms and their placement within the automobile.

Upon crossing the Michigan-Indiana border, Indiana State Police stopped the vehicle. Initially, Guthrie was treated as a suspect, however he had conversations with ATF agents concerning the contents of the automobile. Guthrie informed Agent Gartinbein that there were explosives in a green knapsack and described its location in the vehicle. As he had not seen inside the gun case or the suitcase, Guthrie described the firearms based on his prior conversation with Stevens. Guthrie was then placed in the back of a police car. Gartinbein opened the trunk and noticed a folded up shotgun. He removed it along with the long gun case. He also opened the flap of the Army knapsack and looked inside. Flory and Stevens were then placed under arrest, and the car was taken to a state police post. About 40 minutes after the initial stop, the car was searched at the post. Stevens' shotgun was found in

the long gun case and his .22 caliber pistol was found in the blue suitcase.

Later that evening, a search warrant was executed on Stevens' home. Officers found guns propped against the living room wall near the fireplace, a pistol in a downstairs bedroom and a large number of firearms in the upstairs bedroom.

## MOTION TO SUPPRESS # 1

In his first motion, defendant contends that Agent Guthrie's presence in his home and his resultant observations constitutes an unreasonable warrantless search, therefore evidence subsequently seized pursuant to a warrant should be suppressed. The government contends that Guthrie's observations were obtained by a valid "ruse entry" and therefore the subsequent seizure of firearms pursuant to a warrant was proper. For the reasons set forth below, the Court will deny this motion.

The issue in this motion is whether Guthrie's presence in the home was a valid ruse entry. Ruse entries have been upheld as valid warrantless "consent" searches under the Fourth Amendment. *Lewis v. United States*, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966); *United States v. Ressler*, 536 F.2d 208 (7th Cir.1976). *Lewis* involved the undercover sale of marijuana to a government agent in the defendant's home. The Court found no Fourth Amendment violations because the agent did not see, hear or take anything not contemplated and intended by the petitioner as part of his illegal business. *Ressler* involved an undercover visit to a suspect's home, under the pretext of purchasing firearms, for the purpose of investigating the possible illegal possession of firearms. The Court, citing *Lewis*, held that there were no Fourth Amendment violations as the agents were engaged in activity consistent with their assumed identities and such activity was within the scope of purposes contemplated by the occupant. 536 F.2d at 212. Defendant distinguishes *Lewis* and *Ressler* as involving illegal activity as the express purpose of the agents, and he contends that, in this case, the search was outside of the purpose of refuge and

hospitality as was contemplated by Mr. Stevens. In making this contention, defendant analogizes the case of *Gouled v. United States,* 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921), which was specifically upheld by the *Lewis* decision. See, *Lewis,* 385 U.S. at 211, 87 S.Ct. at 427.

Although *Lewis* involved an invitation to engage in illegal activity and *Ressler* involved illegal transactions upon gaining access to the home, the Court does not view these distinctions as a limitation upon the application of these cases. The rationale of these decisions is that an entry by an undercover agent is not illegal if he entered for the "very purposes contemplated by the occupant." *Lewis,* 385 U.S. at 211, 87 S.Ct. at 427; *Ressler,* 536 F.2d 212. Citing *Gouled,* the Court in *Lewis* limited its holding, cautioning that such a ruse entry does not authorize a general search for incriminating materials. 385 U.S. at 211, 87 S.Ct. at 427. In *Gouled,* an acquaintance of the petitioner, working undercover for the government, entered the petitioner's office under the pretense of a social visit, conducted an unauthorized search of the premises and removed certain papers. Such a search was deemed violative of the Fourth Amendment.

■■■ The Court disagrees with defendant's contention that this case is analogous to *Gouled,* as that case is readily distinguishable. The agent in *Gouled* was clearly outside the contemplated purpose of a social visit when he secretly searched and seized documents. In this case, however, Guthrie was invited into the home, and while there he did not see anything not contemplated by Stevens in the context of the social visit. Guns were in plain view in the living room and Stevens voluntarily showed his gun collection to the agent. Information disclosed to a purported friend is exposed at one's own risk and is not violative of the Fourth Amendment. *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966).

■■■ Defendant contends, however, that an overnight ruse entry is so violative of the Fourth Amendment, that it is unreasonable in spite of any alleged consent. The case most on point concerning this issue is *United States v. Baldwin,* 621 F.2d 251 (6th Cir.1980). In *Baldwin,* an undercover agent posed as a chauffeur and confidant in the home of a suspect for a period of six months. During this time, the agent had free access to the home and observed the suspect in the use and distribution of cocaine. The agent seized samples of the substance which was later used as evidence at trial. The Court upheld the extended presence of the agent, citing *Lewis* for the validity of ruse entries, and *Hoffa* for the proposition that misplaced confidences do not violate the Fourth Amendment. *Id.* at 252, 253. Furthermore, as the cocaine was located on a tabletop and on the floor of a car, the Court upheld its seizure under the "plain view" exception of the Fourth Amendment. *Id.* at 253. As *Baldwin* involved an entry for a number of months, it is controlling precedent for the validity of the overnight ruse entry in this case. Although the Court is mindful of the well-reasoned dissents on the denial of a petition for rehearing *en banc* at the Circuit level and on the denial of the petition for certiorari, both of which critique the rationale of the decision, the Court is nonetheless bound by its precedential value.

Having concluded that Guthrie was present in the Stevens home pursuant to a valid ruse entry and that the guns were in plain view to anyone invited into the living room or the upstairs bedroom, the Court further concludes that the subsequent seizure of the weapons pursuant to a warrant was valid. Accordingly, defendant's motion to suppress # 1 is denied.

## MOTION TO SUPPRESS # 2

In this instance, the defendant contends that the warrantless search of the contents of the trunk of the car violated the Fourth Amendment. He therefore moves to suppress the .22 caliber pistol and the .12 gauge shotgun seized therein. For the reasons set forth below, the Court will also deny this motion.

The resolution of this motion is dependent upon an analysis of the relevant cases involving automobile searches and searches of movable containers located therein. In *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), the Supreme Court upheld the warrantless search of a moving automobile, based on probable cause, because of the "exigent circumstances" of the mobility of the vehicle. This ruling was supplemented by the case of *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) which upheld the delayed warrantless search of an automobile which had been seized pursuant to probable cause.

In *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), there was probable cause to believe that a footlocker contained drugs. After the trunk was loaded into a parked car, it was seized and searched without a warrant about an hour and a half later. The Court found a Fourth Amendment violation, rejecting the application of the *Chambers* rationale to the container. *Chadwick*, however, does not settle the question of whether containers in a car may be searched in an otherwise lawful warrantless search of a vehicle.

In the container case of *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), the Court resolved the issue of whether, assuming a closer relationship between container and vehicle, the container is subject to a warrantless search by virtue of the "automobile exception" to the warrant requirement. In this case, police had probable cause to believe that a suitcase contained marijuana. They followed the suspect and the suitcase into a cab. Several blocks later, police stopped the cab, removed the suitcase from the trunk and performed a warrantless search. The Court found Fourth Amendment violations, applying the *Chadwick* rationale that the lack of mobility of the suitcase required a warrant. In doing so, the Court ignored the *Chambers* holding that if entitled to seize, the police were entitled to search.

*Sanders*, however, did not resolve the question of whether a warrantless search of a container in a car may be made when there is probable cause and other requisite circumstances to undertake a warrantless search of the entire car. This issue was addressed in *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). In *Ross*, the police had probable cause to believe that an automobile contained drugs. They stopped the car, searched the interior, the trunk and the inside of a paper bag located inside the trunk. Inside the bag they found heroin and a subsequent search at the station revealed a leather pouch containing cash which was opened without a warrant. The Court upheld both searches, stating that "the scope of the warrantless search authorized by [the automobile] exception is no broader and no narrower than a magistrate could legitimately authorize by warrant," so that if "probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Id.* at 823, 102 S.Ct. at 2172. The Court upheld *Chadwick* and *Sanders*, distinguishing *Ross* because of the existence of probable cause to search the entire vehicle.

Defendant argues that the factual situation in the case at bar is analogous to that in *Sanders*, while the government analogizes the *Ross* decision. In deciding which line of reasoning applies, the Court must determine whether there was probable cause to search the vehicle generally, or whether there was only probable cause to search a particular container in the vehicle. The *Ross* automobile search rationale controls the former situation, while the *Sanders* container rationale controls the latter and a warrant is required.

Agent Guthrie testified that he knew specifically that the explosives were in Flory's knapsack in the trunk, as he had seen them. He further testified that he knew that Stevens was taking a shotgun and a pistol. He assumed that the shotgun was in the long case because of the nature of

its size and shape, however, he did not know where the pistol was located. It could have been on the person of Mr. Stevens, in the blue suitcase, in the knapsack or elsewhere in the car. Guthrie suspected that the items may have been in the trunk because he saw Stevens loading his gear. Although he may have suspected the trunk and Stevens' gear as the probable location of the pistol, it does not follow that probable cause was lacking as to other parts of the car. Based upon the information obtained from Guthrie, the officers had good reason to suspect that the pistol was being transported in the car and that a search of the vehicle might disclose the evidence. Such a situation arose in the case of *U.S. v. Coletta*, 682 F.2d 820 (9th Cir.1982).

In *Coletta*, an undercover agent made a drug transaction and it was anticipated that, while in an automobile, the drugs would be exchanged and placed in the travel pouch of the agent. The suspect, however, did not exchange the drugs from his travel bag to the agent's. When the surveillance agents stopped the car, both bags were seized and searched without a warrant. Although the agent in the car knew which bag contained the drugs, the Court held that the facts justified the warrantless search of the car because there was probable cause to know that drugs were in the car. The Court further stated that probable cause was not limited to a specific container and that "the bag was of such a size and shape that it was likely to contain drugs." *Id.* at 825–26.

Unlike *Coletta*, the agent here did not have any specific factual knowledge as to where the pistol was located. He knew it was in the car, and assumed that it was in the trunk. On these facts, the Court is of the opinion that the authorities had probable cause to believe that the pistol was in the car, as opposed to a specific container. The warrantless search of the blue suitcase was therefore proper.

 The Court is also of the opinion that the probable cause to search the car extended to the gun case located therein. However, even giving separate considera-

tion to the search of the gun case, the Court concludes that a warrant was unnecessary because the distinctive configuration of the gun case effectively rendered its contents in plain view. Guthrie's suspicions concerning the location of the shotgun were derived from the shape and nature of the gun case. When the contents of a container can be inferred because of its very nature or outward appearance, there cannot be a reasonable expectation of privacy and hence a warrant is not required. *Arkansas v. Sanders*, 442 U.S. at 764, n. 13, 99 S.Ct. at 2593–94, n. 13. Although the Court in *Sanders* specifically referred to a gun case in the context of this rule, this Court predicates its conclusion on the nature of the particular container in this case, along with the circumstances of its possession.

Having concluded that there was probable cause to search the entire vehicle, and having further concluded that the distinctive shape of the gun case rendered its contents in plain view, the warrantless search of the trunk, the blue suitcase, and gun case, was properly executed. Accordingly, defendant's motion to suppress # 2 is denied.