UNITED STATES of America, Plaintiff,

v.

Larry Wayne HARRIS, Defendant.

No. CR–2–95–93.

United States District Court,
S.D. Ohio,
Eastern Division.

April 15, 1997.

George Clark Luther, Hilliard, OH, for Larry Wayne Harris.

Robyn R. Jones, J. Michael Marous, Asst. U.S. Atty., U.S. Attorney's Office, Columbus, OH, for U.S.

## OPINION AND ORDER

KINNEARY, District Judge.

This matter is before the Court on the Defendant Larry Wayne Harris's ("Harris") motion to suppress statements, motion to suppress evidence, and motion to dismiss the indictment. The Court held hearings on these motions on April 1, 1997 and April 9, 1997. The Court **DENIES** Harris's motions.

### I. Findings of Fact

Harris is charged in an indictment with wire fraud and mail fraud. The indictment alleges that Harris used fraudulent misrepresentations to mail order three vial of yersinia pestis, the bacteria that causes bubonic plague, from a Maryland company known as American Type Culture Collection ("ATCC").

The Court begins with the government's version of the facts. At approximately 4:15 p.m. on May 11, 1995, Forrest Smith of the Ohio Department of Health called Edward Sachs of the Lancaster Health Department, and informed Sachs that Harris, a resident of Lancaster, Ohio, had ordered and received vials of yersinia pestis. Smith added that Harris was not qualified to possess the bacteria. (April 1 Tr. p. 6.) Around 5:20 p.m., Sachs contacted Captain Lutz of the Lancaster police department and together they investigated these allegations by confirming some of the details and by calling various health officials at both the state and federal level. (Tr. pp. 9–10.) Later that evening, Captain Lutz obtained a warrant from a state court to search Harris's residence at 266 Cleveland Avenue, Lancaster, Ohio. (Tr. p. 24; Gov. Exh. 1.)

At approximately 1:40 a.m., May 12, 1995, the Lancaster police arrived at Harris's residence to execute the search warrant. (Tr. pp. 24, 26.) The search team included public health officials, members of the Fairfield

County hazardous materials team, and a hazardous materials truck full of equipment and gear. (Tr. pp. 26, 54.) Some of the officers and members of the hazardous materials team were dressed in hazardous material suits. (*Id.*)

Captain Lutz and Lieutenant Regan approached the house in their regular uniforms. Lutz went to the door and lured Harris out of his residence by telling him his car had been involved in a hit-skip accident. (Tr. pp. 27, 54–55.) After Harris stepped out of his residence, Captain Lutz walked him over to Harris's car where Regan was standing; Lutz and Regan then handcuffed Harris over the hood of his car. (Tr. pp. 28–29, 55.) While they were handcuffing Harris, Harris spontaneously told them "if this is about the pestis, it's in the car." (Tr. pp. 30, 35–56, 57–58, 59.) Regan asked Harris's permission to search the car, which Harris granted; Harris told the officers that his keys were in his pocket. (Tr. pp. 30, 56, 58.) Lutz and Bill Bropst of the Fairfield County hazardous materials team searched the car while Regan read Harris his rights. (Tr. pp. 32, 56–57.) Harris was very talkative during this period, and told various officers and health agents that the pestis was safe to handle. (Tr. pp. 32–33, 56–57, 58.) Regan had to ask Harris to quit talking so that Regan could finish reading his rights. (*Id.*) After the vials were found in the car, Harris was placed in the back of a police vehicle and eventually transported to the Lancaster police station where he was held for questioning. (Tr. pp. 33, 57.) Lutz and Regan returned to the police station separately and interrogated Harris.

The police interrogated Harris at the Lancaster police station at around 2:40 a.m. The officers taped the interrogation with Harris's knowledge. (Gov. Exh. 6; Tr. pp. 74, 88.) Harris did not tell the officers that he wanted an attorney either before or during this interrogation. (Tr. pp. 34, 58.) After the interrogation, Harris was returned to his residence.

Later on May 12, the Lancaster police contacted the Federal Bureau of Investigation ("FBI") and Special Agent Roger Wilson was assigned to the case. (Tr. p. 63.) When Wilson arrived at the police station, the police briefed him on the case. Sometime that morning, the Chief of Police told Wilson that, during a phone conversation with Harris about Harris's impounded car, Harris asked the Chief whether the Chief thought that Harris needed an attorney. (April 9 Tr. p. 6.) The Chief responded "that's up to you." *Id.* Harris was at his residence at the time of the phone call. (*Id.* at 6–7, 10)

While Wilson contacted his superiors, the police used information gathered during the first search and interrogation to obtain an arrest warrant for Harris and a warrant to search his house again. (April 1 Tr. p. 64.) That afternoon, Lieutenant Michael Rosser went to Harris's residence to serve the arrest warrant on Harris. (Tr. p. 92.) Rosser asked Harris to step outside, Rosser read Harris the warrant and then placed Harris under arrest. (Tr. p. 93.) Rosser read Harris his *Miranda* rights at this time. (Tr. p. 74.) Harris did not say anything about an attorney to Officer Rosser. (Tr. p. 94.) Patrolman Gardner then cuffed Harris and transported him to the Lancaster Police Department. (Tr. p. 94.) Harris did not say anything at all on the ride to the station. (Tr. p. 66.)

Special Agent Wilson interrogated Harris at the police station. Wilson testified that when he introduced himself to Harris, Harris "immediately indicated to me that he wanted to tell me his side of the story regarding having the bubonic plague." (Tr. p. 66.) Wilson then handed Harris a waiver form and read from a copy of the form as Harris followed along. (Tr. p. 67; Gov. Exh. 8.) Wilson proceeded with the interrogation after Harris signed the waiver form. (Tr. p. 67.) Harris did not ask Wilson for an attorney nor did he mention to Wilson that he had called an attorney. (Tr. p. 68.)

For the most part, Harris does not dispute the facts as stated above. However, he takes several crucial exceptions. First, Harris contends that no one read him his *Miranda* rights until the arrest warrant was executed. (Tr. p. 74.) Second, Harris claims that he never consented to the search of his car or informed the officers that his keys were in his pocket. (Tr. pp. 74, 75, 76.) Third, Harris claims that in addition to telling the

police chief over the phone that he had contacted an attorney, he also told the arresting officer and Special Agent Wilson that he had contacted his attorney. (Tr. pp. 79, 80, 81, 84.)

Resolving these factual disputes is crucial to the decision of whether to grant or deny Harris's motions. Given the conflicting testimony, the resolution of these factual disputes depends upon whom the Court finds more credible. After observing the demeanor of the government witnesses and of Harris, the Court finds the government witnesses more credible than Harris. The Court doubts Harris's trustworthiness for three reasons.

First, Harris's testimony at the April 1 hearing is inconsistent with his statements at the first interrogation at the police station. When asked at the hearing whether he had a laboratory in his home, Harris testified:

> I most certainly do, most definitely do.... I have, by all practical purposes, a very fine laboratory, very well equipped laboratory, even backup microscopes, backup equipment, and do extensive research.

(Tr. p. 77.) Despite Harris's emphatic certainty, this testimony is directly contradicted by a number of Harris's earlier statements. (*See, e.g.,* Gov. Exh. 6 at p. 11 ("I've been wanting to accumulate enough laboratory equipment so that I can build my own laboratory"); p. 13 ("Once I got my lab together."); p. 14 ("Once I get the laboratory going I can go ahead"); p. 23 ("I do not have, in my possession, the necessary equipment at this time to carry out the experiment."); p. 24 ("once I got my lab going").) Similarly, Harris testified that he "most definitely did not consent to the search of the vehicle." (Tr. p. 74.) Yet, Harris admitted during the initial interrogation that he volunteered the information about the location of the pestis and of his car keys to the officers. (Gov. Exh. 6. at p. 1.) Harris explained the inconsistency by saying that he was half asleep at the time he volunteered the information. This explanation, however, does not dispel the inconsistency.

Second, Harris spoke with certainty throughout his testimony when referring to events that were favorable to him. (*see* Tr. p. 74 ("[Lutz] most definitely did not advise me

of my rights"); p. 75 (same); p. 78 ("most definitely" tried to call attorney"); p. 79 ("most definitely" advised officers of call to attorney); p. 85; p. 89; p. 90.) Yet, when asked about events that were less favorable to him, Harris seemed uncertain and somewhat incoherent. (*See, e.g.,* Tr. pp. 82–83 ("I did not see [the waiver of attorney clause]"; "I did not understand it"; "I did not understand the fullest context of it."))

Third, the collective testimony of the government witnesses tells a consistent, coherent story of the events that occurred that night. Harris, on the other hand, provided little or no evidence to corroborate his testimony and his testimony was incoherent at times. (*See e.g.,* Tr. pp. 78–80, 82–83.)

In sum, based on the above three reasons and on the Court's observation of Harris's demeanor at the hearing, the Court finds that Harris's version of the facts is unreliable. The Court therefore adopts, for the purpose of resolving Harris's motions, the facts as stated in the testimony of the government witnesses.

## II. Analysis

### A. The First Warrant

Harris raises numerous challenges to the state court's finding of probable cause to support the first warrant. The government argues that there was probable cause for the first warrant. The Court agrees with the government.

"The test for probable cause is simply whether 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Padro,* 52 F.3d 120, 123 (6th Cir.1995) (quoting *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)). Thus, the issuing judge must "make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information," probable cause exists. *Id.* A reviewing court, in turn, must give great deference to the decision of the issuing judge. *Id.* at 236, 103 S.Ct. at 2331. The role of the reviewing court is limited to en-

suring that the issuing judge had a " 'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing." *Id.* at 238–39, 103 S.Ct. at 2332 (quoting *Jones v. United States,* 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)).

The affidavit supporting the first warrant was prepared by Captain Lutz and Ed Sachs. (Tr. p. 21.) In the affidavit, Captain Lutz traces the official lines of communication from ATCC, who sent the bacteria to Harris and then became suspicious of his credentials, through the Center for Disease Control ("CDC") and the Ohio Department of Health, to Ed Sachs at the Lancaster Department of Health. (Gov.Exh. 1.) Lutz states that a call by the CDC to Harris corroborated ATCC's initial concern; Harris told a CDC official that he was conducting research with the bacteria to counteract an "imminent invasion from Iraq of super-germ-carrying rats." Lutz confirmed with the delivery company the exact time and date of the delivery of the bacteria to Harris's residence. Lutz also confirmed the allegations that Harris may have misrepresented to ATCC both that he had an Environmental Protection Agency certification number and that he had a small animals laboratory. Captain Lutz concluded that "Larry Wayne Harris probably used deception" to obtain the bacteria. The Court finds that this affidavit provided a substantial basis for the issuing judge's finding of probable cause to support the first search warrant.

 Probable cause for a search warrant does not require certainty that a crime has been committed or that the evidence will be present in the residence to be searched. *See, e.g., United States v. Caicedo,* 85 F.3d 1184, 1192 (6th Cir.1996). On the date of the warrant, Captain Lutz had information that Harris had ordered the bacteria and had misrepresented himself to ATCC, and that the bacteria had been delivered to his residence earlier that day. (Gov.Exh. 1.) The issuing Court therefore had a sufficient basis on which to conclude that an offense had been committed and that the bacteria was probably in Harris's residence. Contrary to Harris's assertions, the use of the term "probably" in the affidavit, and the presence of hearsay in the affidavit, do not undermine the issuing judge's finding of probable cause for the warrant. (Doc. # 13 at p. 10.) *Caicedo,* 85 F.3d at 1192–93 (finding probable cause based upon an affidavit that included the statements that incriminating evidence "could be" and "may be" present in a suspect's residence); *United States v. Plemmons,* 336 F.2d 731, 734 (6th Cir.1964) (a substantial basis for crediting hearsay evidence exists where a government officer is the declarant of the hearsay.)

 Harris also asserts that the warrant was overbroad and did not adequately describe the property to be searched for and seized. (Doc. 13 at p. 2.) The Fourth Amendment requires a warrant "to particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The warrant must enable a searcher to reasonably ascertain and identify the things which are authorized to be seized. *United States v. Blakeney,* 942 F.2d 1001, 1026 (6th Cir.1991). This requirement eliminates the danger of unlimited discretion in the executing officer's determination of what is subject to seizure. *Id.* The search warrant in this case satisfies this standard. The search warrant provides in part as follows:

> As Judge of the Above Court of record, I command you [Captain Lutz] ... to search ... the person and/or place of: The residence of Larry Wayne Harris, 266 Cleveland Avenue, Lancaster Ohio. Property which is the subject to search and seizure, to wit: Three vials of yersinia pestis (Bubonic Plague Virus [sic] ), any and all records concerning the purchase and use of hazardous cultures.

(Gov.Exh. 1.) The Court concludes that this description reasonably identifies the three vials of yersinia pestis and the files authorized to be seized and properly limits the discretion of the executing agent. Therefore, the first warrant was validly issued by the state court.

### B. The First Search

### 1. Harris's challenges to all of the evidence seized.

Harris moves to suppress all of the evidence seized during the first search on the

ground that the execution of the warrant was illegal because (1) the officers failed to knock and announce their identity and purpose; (2) the officers used a ruse to get Harris to leave his house; and (3) the officers illegally detained Harris. The government denies that the police acted illegally when they executed the search warrant.

▇ First, the "knock and announce" rule to which Harris refers is inapplicable here because the officers did not make a forced entry into Harris's home. *United States v. Gatewood,* 60 F.3d 248, 250 (6th Cir.1995) (holding that neither the Fourth Amendment nor the knock and announce statute, 18 U.S.C. § 3109, are implicated where there is no evidence of forcible entry).

▇ Second, the officers' use of a ruse—telling Harris his car was in a hit-skip accident to lure him outside his residence—was valid in light of the circumstances. Courts have upheld the use of ruses when police officers have deceived suspects so that the officers may gain consent to enter the suspect's home and conduct a warrantless search. *Lewis v. United States,* 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1967) (agent posed as customer to enter drug dealer's home without a warrant); *United States v. Baldwin,* 621 F.2d 251 (6th Cir.1980) (agent posed as chauffeur for six months to observe cocaine distribution); *United States v. Stevens,* 635 F.Supp. 1356 (W.D.Mich. 1986). In addition, the First Circuit has upheld the use of a ruse by government agents to get suspects to leave a motel room so that the agents could, without a warrant, arrest them and search their room. *United States v. Rengifo,* 858 F.2d 800, 804 (1st Cir.1988). The ruse in this case was far less intrusive than the ruses in the above mentioned cases. Unlike the law enforcement personnel in those cases, the police officers in this case had a properly issued warrant to search the premises, they did not use the ruse to gain entrance into Harris's home, and the ruse did not last more than a few moments. Therefore, the Court holds that the police officer's use of a ruse to lure Harris from his home was not invalid.

▇ Finally, the Court holds that the officer's detention of Harris while they conducted their search was also valid. When police obtain a warrant to search a residence they also obtain the right to detain persons on the premises and take other such reasonable action that is necessary to protect themselves during the execution of the search. *Michigan v. Summers,* 452 U.S. 692, 705, 101 S.Ct. 2587, 2595, 69 L.Ed.2d 340 (1981). In this case, the use of the ruse and subsequent detention of Harris were reasonable actions necessary for the protection of the officers. When the officers approached Harris's residence, they did not know Harris's motivations or the specific dangers that they would face; this was a new situation for them and it involved a potentially deadly pathogen. (*See, e.g.,* Tr. pp. 25–26, 55.) Therefore, both the ruse and detention were justified.

### 2. Statements made during the search.

Harris moves to suppress all of his statements made during the search on the ground that any statements he made were the result of police interrogation, while he was in custody, and before he had been read his *Miranda* rights. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Harris also moves to suppress any evidence found by the officers in reliance on those statements. The government argues that the police did not interrogate Harris before they read him his *Miranda* rights, or in the alternative, that the "public safety" exception to *Miranda* applies.

The Supreme Court has found that, in certain circumstances, concern for public safety justifies an officer's failure to provide *Miranda* warnings before asking questions devoted to locating a dangerous instrumentality. *New York v. Quarles,* 467 U.S. 649, 657, 104 S.Ct. 2626, 2632, 81 L.Ed.2d 550 (1984). The *Quarles* Court held that the Fifth Amendment, as interpreted in *Miranda,* does not require the exclusion of a defendant's voluntary statements about the location of his gun, or the gun itself, when an officer asked the defendant where the gun was located while the defendant was in custody and before the officer read the defendant his rights. The Court stated that in a "kalei-

**1134**

doscopic situation ... in which spontaneity rather than adherence to a police manual is necessarily the order of the day," the officers need not read a suspect his *Miranda* rights prior to asking questions reasonably prompted by a concern for public safety. *Id.,* 467 U.S. at 656, 104 S.Ct. at 2631.

The Court finds that the public safety exception to *Miranda* applies here. This investigation presented circumstances in which spontaneity rather than adherence to a police manual was the order of the day. Captain Lutz testified that no one in Lancaster had participated in a search for a deadly bacteria and, without assistance from someone who had, the officers had to "fly by the seat of our pants." (Tr. pp. 25–26.) The evidence shows that the officers were motivated by a concern for public safety when they questioned Harris prior to reading his rights; indeed, concern for public safety motivated this whole investigation as indicated by the presence of the hazardous materials team and the precautions taken by the officers. (Tr. pp. 11–12, 22–23, 25–28.) As in *Quarles,* the officers asked Harris only the questions needed to locate the dangerous instrumentality; Regan then read Harris his rights. In hindsight, it is possible to say that the immediate risk to the public posed by the freeze-dried bacteria was not as significant as the officers thought at the time. At the time the officers were faced by these circumstances, however, it was reasonable for them to anticipate danger from this bacteria and to have serious concern for the safety of the community and for their own safety. Therefore, the Court holds that the public safety exception to the *Miranda* rule applies here. As a result, any statements made by Harris before Lieutenant Regan read him his rights, and any evidence recovered in reliance on those statements, is admissible for purposes of trial.

### 3. The search of the car.

Harris argues that anything found in his car should be suppressed because the search of the car was outside the scope of the search warrant and no exception to the rule precluding warrantless searches applies in this case. (Doc. # 13 at p. 2, 5; Doc. # 14 at p. 3.) The Government argues that the officers were entitled to search the car for two reasons: first, Harris consented to the search; and second, they had probable cause to believe the vials were in the car. (Doc. # 21 at pp. 1–2, 4, 5.)

The Court holds that evidence found in the car is admissible because the search of the car was valid on a number of alternative theories. First, the Court holds that the warrant authorized the search. A warrant to search a residence at a particular address confers authority to search a vehicle parked in the driveway if the officers executing the warrant reasonably believe that the objects of the search might be located in the vehicle. *United States v. Gottschalk,* 915 F.2d 1459, 1461 (10th Cir.1990) (search of car in driveway); *United States v. Asselin,* 775 F.2d 445 (1st Cir.1985) (search of car next to carport); *United States v. Napoli,* 530 F.2d 1198 (5th Cir.1976) (search of camper in driveway). The warrant in this case describes the premises to be searched as a residence at a particular address. Harris's car was parked in his driveway in front of a car port. Given the size of the vials, the officers could reasonably believe that the vials might be in the car. Moreover based on Harris's statement that the pestis was in the car, the officers had reason to believe that the vials were in the car. Therefore, the officers were authorized by the warrant to search the car. The officers were authorized to open the locked glove box because vials are small enough to fit in that compartment. *See Cole,* 628 F.2d at 899 (authorizing the search of an attache case found in a truck.)

Second, the officers were justified in searching the car because Harris's statement that the pestis is in the car provided the officers with probable cause to search the car. *See United States v. Pasquarille,* 20 F.3d 682, 685–87 (6th Cir.1994) (finding probable cause to conduct warrantless search of vehicle); *United States v. Elkins,* 732 F.2d 1280, 1286 (6th Cir.1984).

Finally, the Court finds that the police were justified in searching the car because Harris consented to the search of his car. *See Schneckloth v. Bustamonte,* 412

U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). Harris voluntarily told the officers that the pestis was in the car and that his car keys were in his pocket. Harris claims that he took sleeping pills and was asleep when the officers arrived; however, in his interrogation answers, Harris provided details and descriptions of his motivations and research that are inconsistent with a drug impaired or sleep deprived mind. Therefore, the Court finds that the consent was knowing and intelligent. The officers were justified in searching Harris's car based on Harris's consent to search.

## C. The First Interrogation

Harris moves to suppress any statement he made during the first interrogation because he claims he was not advised of his *Miranda* rights and did not waive those rights prior to the interrogation. (Doc. # 11 at p. 3.) The government claims that Harris was advised of his rights and voluntarily waived his rights before making any statements to law enforcement officers.

This Court has already found that Lieutenant Regan read Harris his *Miranda* rights after Regan handcuffed him and while Lutz was searching the car. Moreover, the Court has found that any statement Harris made to the officers at his residence was not coerced or involuntary. The only remaining issue, therefore, is whether Harris voluntarily waived his rights prior to the interrogation.

■■■ Harris's answers to the officer's interrogation at the police station were the result of a voluntary and intelligent waiver of his rights. Harris was very talkative and very willing to discuss his case to the officers during the interrogation. Harris provided long rambling answers in which he describes in extensive detail his research and motivations. (*See* Tr. pp. 3, 4, 5, 10.) Also, Harris admitted in the interrogation that the officers treated him decently and fairly and that the police made no threat against him. (Tr. p. 29.) Given Harris's age, education and the detail and description provided in his answers during the interrogation, the Court concludes that Harris voluntarily and intelligently waived his rights prior to the first interrogation.

## D. The Second Warrant

Harris challenges the validity of the second warrant on the grounds that it was supported by information obtained during the execution of the first warrant and that the first warrant was invalid. (Doc. # 13 at p. 11.) This argument fails because the Court has already held that the first warrant was valid.

## E. The Second Interrogation

Harris moves to suppress any statement he made during the second interrogation because he claims he invoked his right to an attorney and the officers interrogated him without his attorney present anyway. (Doc. # 11 at p. 4.) Moreover, Harris asserts that the second interrogation was the product of the first interrogation which was itself illegal. (*Id.*) This latter argument fails because the Court has already found that the first interrogation was valid.

■■■ With respect to the former argument, the only issue is whether Harris's statement to the Chief of the Lancaster Police, "do you think I need an attorney," was sufficient to invoke Harris's right to an attorney under the rule of *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). *Edwards* states that when an accused has invoked his right to have counsel present during custodial interrogation, no further interrogation is permitted until either his right is satisfied or the accused himself initiates further interrogation. The *Edwards* rule applies, however, only if the accused invokes his right to an attorney while in custody. *See Minnick v. Mississippi,* 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990) ("the police must terminate interrogation of an accused in custody if the accused requests the assistance of counsel"); *Oregon v. Bradshaw,* 462 U.S. 1039, 1043, 103 S.Ct. 2830, 2833, 77 L.Ed.2d 405 (1983) ("*Edwards* is a prophylactic rule, designed to protect an accused in police custody from being badgered by police officers") *United States v. Mills,* 1 F.3d 414, 417 (6th Cir.1993) ("*Edwards* held that once a person in custody has expressed his desire to deal with the police only through counsel, the police violate his or

her rights if they initiate further questioning"). The *Edwards* rule does not apply here because Harris was at his home and not in custody, when he asked the police chief: "do you think I need an attorney?"

The government, nevertheless, still bears the burden of showing that Harris waived his right to counsel, along with his other *Miranda* rights, prior to the second interrogation. *Maglio v. Jago,* 580 F.2d 202, 204–5 (6th Cir.1978). The government introduced a waiver of rights form signed by Harris. (Gov.Exh. 8.) The government also introduced the testimony of Special Agent Wilson who stated that he read this form to Harris and that Harris was very willing to tell his side of the story. This evidence satisfies the government's burden to show that Harris voluntarily and intelligently waived his rights.

### F. The Arrest

Harris claims that the criminal complaint was filed without probable cause and that, therefore, his arrest was unlawful. (Doc. # 14 at p. 4.) In particular, Harris asserts that the complaint charges him with receiving stolen property and that there is no evidence that the vials were obtained through the commission of a theft offense. (*Id.* at p. 3.) The Court disagrees. Probable cause to arrest is sufficient if there are facts and circumstances within the issuing judge's knowledge that are sufficient to allow a reasonably prudent person to believe that a suspect has committed an offense. *Harrison v. Metro Government of Nashville,* 80 F.3d 1107, 1107 (6th Cir.1996), This standard is satisfied here. The Lutz affidavit and the results of the search provided the issuing judge with evidence that Harris used deception to receive the vials from ATCC. The theft element of the crime of receiving stolen property is satisfied by theft by deception. *See* O.R.C. §§ 2913.02, 2913–51. Therefore, the criminal complaint and the warrant to arrest Harris for receiving stolen property were supported by probable cause.

### III. Conclusion

Upon consideration and being duly advised, the Court **DENIES** Harris's motion to suppress statements, **DENIES** Harris's motion to suppress evidence, and **DENIES** Harris's motion to dismiss the indictment.

IT IS SO ORDERED.