OPINION
Plaintiff-appellant, the state of Ohio, appeals a decision of the Butler County Court of Common Pleas granting the motion to suppress filed by defendant-appellee, Terry Coleman. We reverse the trial court's decision.
Coleman was indicted in June 2001 on one count of gross sexual imposition in violation of R.C. 2907.05(A)(4) for fondling Kimberly C., the then eleven-year-old daughter of Coleman's girlfriend, Debbie Hughes. At the time, Coleman, Hughes, and Hughes' three children all lived together in Middletown, Ohio. They had previously lived in California. On July 12, 2001, Coleman filed a motion to suppress statements he had made while at the Middletown Police Department. A hearing on the motion revealed the following facts:
In April 2001, Kimberly reported to a social worker at school that Coleman had fondled her. As a result, on April 10, 2001, Detectives Janice Brown and Fred Shuemake of the Middletown Police Department, Juvenile Section, invited Coleman to come to the police station to talk about a matter involving his girlfriend's child. There, after asking Coleman several questions about his own family and job, the detectives read Coleman his Miranda rights. Upon reading them, the detectives asked Coleman if he wished to talk to them without the presence of an attorney. The following dialogue ensued:
 Coleman: Um, not really. This is obviously a very serious thing here and I don't wish to. I wish to rely on my Fifth Amendment right? Not to be compelled to be a witness against myself.
 Officer: Okay, so you don't want to talk to us at all, I mean, without your lawyer.
 Coleman: Not without council [sic]
Officer: This is what you attempted to do . . .
Coleman: I've never been told what the charges are.
Thereafter, the detectives told Coleman that he had not been charged with anything but that he was accused of something, that they had one side of the story, that in such a situation their first course was to talk to the person being accused, that it was Coleman's right not to talk to them, and that even if he decided to start talking, he could stop talking at any time. Coleman told the detectives he had been set up by the police a week earlier when he had sold alcohol to an underage girl at the gas station where he worked.
Regarding his sale of alcohol to an underage girl, Coleman explained to the detectives that he viewed that as an entrapment, and that "[t]here are some people you trust and some people you don't. I'm being very honest with you here on that issue. Okay?" After one of the detectives replied "I appreciate that[,]" Coleman told them that "I don't know where you're coming from here, I don't even know what this person, obviously one of the children has said something that's got you concerned and you probably have reason to be concerned."
After Coleman's foregoing statement, the interview returned to the subject of Miranda rights. The detectives reiterated to Coleman that he could stop talking at any time, and that he was not compelled to incriminate himself or be a witness against himself. The detectives also told Coleman that he was neither being detained nor under arrest, that he was there on his own free will, and that he could leave. The detectives then asked Coleman to sign the Miranda card. Coleman refused, stating that "anything I say can and will be used against me and I'm not a lawyer and sometimes the way you say things it comes over different. I just don't feel comfortable." The detectives told him that it was fine.
Thereafter, the interview turned to the subject of the Middletown city water. During that conversation, Coleman abruptly asked "Is it with Kyle or can you tell me?" One of the detectives replied "No it is not with Kyle." The detective also stated "I know there was an incident awhile back," to which Coleman replied "Yeah there was." The interview then turned to the subjects of how to contact Hughes, Coleman's sale of alcohol to an underage person, the meaning of contributing to delinquency, and the shooting of a young man by a police officer in Cincinnati, Ohio.
Subsequently, Hughes arrived at the police station. The detectives told Coleman he could wait out in the lobby. Coleman agreed to wait out in the lobby but apparently returned to the room where Hughes and the detectives were. The detectives introduced themselves to Hughes and told her what the allegations were. Hughes told the detectives that a fondling incident had occurred in Farmersville, Ohio and that she, Kimberly, and Coleman had talked about it and taken care of it. Hughes asked the detectives if she could speak with Coleman. After one of the detectives told Hughes that she could speak with Coleman if she wanted to, and that the detective was not going to prevent her from talking to Coleman, Hughes point blank asked Coleman "Is Kimberly right? Is this still going on? Has this happened since Farmersville?" Coleman replied "As I've told them Debbie I don't feel comfortable talking without talking to my counselor. That way, you don't know how to talk to them. The four of us are talking. These are serious charges."
Following Coleman's reply, the conversation between Hughes, Coleman, and the detectives turned to child care arrangement for Hughes' children. During that conversation, Coleman stated "I'm just sorry all this has developed the way it has. I'm not saying that I'm admitting any liability here on these recent charges, I'm just saying that this is where it's at." Later on, during the conversation, one of the detectives stated that when confronted with this type of allegations, it was his job to find out so that he could sleep at night. The detective then stated "see the thing of it is, is [Kimberly is] giving me a history of this happening as far back as California[.]" Coleman stated it could have been with someone else. The conversation eventually concluded and Coleman left the police station. He was not arrested.
By opinion and judgment entry filed October 5, 2001,[1] the trial court granted Coleman's motion to suppress. Upon citing Miranda v.Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, and two other cases for the proposition that once an accused asserts his right to an attorney, the accused may not be interrogated until an attorney has been provided to him unless the accused initiates further communication with the police, the trial court found that
 [Coleman] did assess [sic] his right to counsel and did not waive that right to counsel.
 The Court finds that * * * Coleman requested counsel hence the questioning and any responses subsequent to the request for counsel must be suppressed pursuant to the decision of the law of both the U.S. Supreme Court and the Ohio Supreme Court.
The state appeals and assigns as error that the trial court erred by granting Coleman's motion to suppress. Specifically, the state argues that Coleman was no longer interrogated by the detectives after he stated "I've never been told what the charges are." The state asserts that "[r]ather, a conversation continued [at that point in time] * * * with the detectives attempting to answer his question without intending to engage in any further line of questioning about the crime." The state asserts that Coleman's foregoing statement, "inquiring as to what allegations had been made against him, initiated the conversation or exchanges with the police," in compliance with Edwards v. Arizona
(1981), 451 U.S. 477, 101 S.Ct. 1880.[2]
When considering a motion to suppress evidence, the trial court serves as the trier of fact and is the primary judge of the weight of the evidence and the credibility of witnesses. State v. Fanning (1982),1 Ohio St.3d 19, 20. When reviewing a trial court's decision on a motion to suppress, an appellate court must accept the trial court's factual findings if they are supported by substantial and credible evidence.State v. Williams (1993), 86 Ohio App.3d 37, 41. An appellate court, however, reviews de novo whether the trial court applied the appropriate legal standard to the facts. State v. Anderson (1995),100 Ohio App.3d 688, 691.
We note at the outset that in response to the state's appellate brief, Coleman does not argue that the statements he made at the police station incriminated him. Rather, Coleman solely argues that once he asserted his right to counsel during the interview, without subsequently waiving it, the questioning by the police should have stopped. Coleman also argues that he did not re-initiate the conversation with the police after he asserted his right to counsel. We note that Coleman made no admission regarding the Middletown fondling allegation during either his interview with the detectives or the conversation between Hughes, the detectives, and Coleman. Nor can we say that his statements were necessarily incriminating. However, in light of the United States Supreme Court's mandate that exculpatory or inculpatory statements obtained in violation of Miranda be suppressed, we will address the state's assignment of error under the premise that some of Coleman's statements could be potentially incriminating.
The "prosecution may not use statements, whether exculpatory or inculpatory, stemming from a custodial interrogation unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda, 384 U.S. at 444,86 S.Ct. at 1612. Once Miranda warnings have been given, if a suspect asserts his right to counsel, the interrogation must cease until an attorney is present. Id. at 474, 86 S.Ct. at 1628. "[A]n accused * * * having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards, 451 U.S. at 484-485, 101 S.Ct. at 1885.
It is well-established that Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him in custody. Oregon v. Mathiason (1977), 492 U.S. 492, 494,97 S.Ct. 711, 713. Similarly, the Edwards rule applies only if the accused invokes his right to an attorney while in custody. United States v.Harris (S.D.Ohio 1997), 961 F. Supp. 1127, 1135. See, also, Minnesotav. Murphy (1984), 465 U.S. 420, 424, 104 S.Ct. 1136, 1140, at fn. 3;State v. Fry (1988), 61 Ohio App.3d 689; State v. Meyers (Sept. 28, 2001), Allen App. No. 1-10-48, unreported.
In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there [was] a `formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler (1983), 463 U.S. 1121, 1125,103 S.Ct. 3517, 3520. "Under this standard, a suspect obviously is in custody if he is formally placed under arrest prior to interrogation. Where the suspect has not been formally arrested, the restraint on the suspect's freedom of movement must be significant in order to constitute custody."State v. Staley (May 8, 2000), Madison App. No. CA99-08-019, unreported, at 7.
While "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime[,]" a noncustodial situation is not converted into a custodial situation simply because questioning takes place in a police station. Mathiason, 429 U.S. at 495,97 S.Ct. at 714. Rather, the initial determination of whether an individual is in custody, for purposes of Miranda, depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned. Stansbury v.California (1994), 511 U.S. 318, 323-324, 114 S.Ct. 1526, 1529.
Thus, "a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of Miranda." Id. at 324, 114 S.Ct. at 1529-1530. "An officer's knowledge or beliefs may bear upon the custody issue, [however], if they are conveyed, by word or deed, to the individual being questioned." Id., 114 S.Ct. at 1530. Yet,
 Those beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her "freedom of action." * * * Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest.
Id.
In the case at bar, the trial court granted Coleman's motion to suppress solely on the grounds that Coleman had invoked his right to counsel while being interviewed at the police station and that he had not subsequently waived it. A review of the record, however, clearly shows that Coleman was not in custody either while being interviewed by the detectives or subsequently during his conversation with the detectives and Hughes. Coleman came voluntarily to the police station. There, the detectives told Coleman that he was not under arrest or legally detained, and that he was free to leave at any time. The detectives also told Coleman that he was free to stop their questioning at any time. The detectives never placed Coleman into custody. At the conclusion of his conversation with Hughes and the detectives, Coleman left the police station without hindrance. He was not arrested. We therefore find that the entire time he was at the police station, Coleman was not in custody or otherwise deprived of his freedom of action in any significant way. As a result, Miranda warnings were not required.
We are mindful that Miranda warnings were nevertheless given to Coleman. However, the mere giving of Miranda warnings by a law enforcement officer does not convert a noncustodial setting into a custodial setting. See United States v. Owens (C.A.5, 1970), 431 F.2d 349. "The precaution of giving Miranda rights in what is thought could be a non-custodial interview should not be deterred by interpreting the giving of such rights as a restraint on the suspect, converting a non-custodial interview into a custodial interrogation for Miranda purposes." UnitedStates v. Lewis (C.A.6, 1977), 556 F.2d 446, 449. It follows then that the Edwards rule did not apply and the detectives were not required to cease the interview and provide Coleman with an attorney.
In light of all of the foregoing, we find that Coleman was not subject to a custodial interrogation at the April 10, 2001 meeting with the detectives and that, as a result, his statements were voluntarily given. We therefore find that the trial court erred by granting Coleman's motion to suppress. The state's sole assignment of error is well-taken and sustained. The decision of the trial court is reversed and the matter is remanded for further proceedings according to law and consistent with this opinion.
POWELL and VALEN, JJ., concur.
[1] In its judgment entry, the trial court stated it had reviewed,inter alia, "a written statement by the officer signed by defendant" and "a letter of apology written by defendant." No such written statement or letter of apology was submitted. While Coleman orally apologized to Hughes three times during their conversation with the detectives, the record shows he did not apologize for his sexual misconduct with Kimberly. Rather, Coleman merely apologized for creating a situation where Hughes had to find someone, other than Coleman, to watch her children when she is at work.
[2] In its brief, the state states that it does not dispute the trial court's single finding of fact that Coleman asserted his right to counsel. Rather, the state contends that the trial court erred by making that single fact determinative of the motion to suppress.