**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES AMERICA,<br>*Plaintiff-Appellee*,<br><br>v.<br><br>STEFAN RAMIREZ,<br>*Defendant-Appellant.* | No. 18-10429<br><br>D.C. No.<br>1:17-cr-00207-<br>LJO-SKO-1<br><br>OPINION |

Appeal from the United States District Court
for the Eastern District of California
Lawrence J. O'Neill, District Judge, Presiding

Argued and Submitted November 12, 2019
San Francisco, California

Filed September 25, 2020

Before: Sidney R. Thomas, Chief Judge, and Kim McLane
Wardlaw and Daniel P. Collins, Circuit Judges.

Opinion by Judge Wardlaw;
Dissent by Judge Collins

# SUMMARY[*]

## Criminal Law

The panel reversed the district court's denial of a suppression motion, and remanded for further proceedings, in a case in which the defendant entered a conditional guilty plea to receipt and distribution of material involving the sexual exploitation of minors.

FBI agents investigating child pornography offenses obtained a warrant to search the defendant's residence and any vehicle registered to him located at or near the residence. Under the warrant and the law established by *Michigan v. Summers*, 452 U.S. 692 (1981), the agents had no authority to seize the defendant or search his car when they arrived to execute the warrant, because neither was at the residence. The agents manufactured the authority to seize them by falsely claiming to be police officers responding to a burglary to lure the defendant home. By luring the defendant home, the agents' successful deceit enabled them to obtain incriminating statements from the defendant and evidence from his car and person.

The panel held that, under the particular facts of this case, the agents' use of deceit to seize and search the defendant violated the Fourth Amendment. Balancing the Government's justification for its actions against the intrusion into the defendant's Fourth Amendment interests, the panel concluded that the Government's conduct was

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

clearly unreasonable. The panel rejected the Government's argument that the agents never seized the defendant, and wrote that the seizures of the defendant and the electronic devices in his car were the direct result of the FBI agents' unreasonable ruse. The panel held that the Government failed to carry its burden to show that the defendant's incriminating statements, made after an agent revealed the true purpose of the investigation and asked to speak with him, were not obtained through exploitation of illegality rather than by means sufficiently distinguishable to be purged of the primary taint.

Dissenting, Judge Collins wrote that the core Fourth Amendment requirements of probable cause and a particularized warrant were satisfied with respect to a search of the defendant's car for child pornography; that the agent's subsequent use of the ruse only affected the manner in which the search fulfilled the condition that the car be searched while it was at the defendant's house, which is not one that was required by the Fourth Amendment; that even assuming that a brief initial pat-down of the defendant was an unconstitutional seizure, the defendant's subsequent confession was in no sense a fruit of that momentary frisk; and that the defendant was not seized during his subsequent interview with two FBI agents that was conducted in his own home, so his confession cannot be suppressed on the theory that it was a fruit of any such alleged seizure.

**COUNSEL**

Peggy Sasso (argued), Assistant Federal Defender; Heather E. Williams, Federal Defender; Office of the Federal Public Defender, Fresno, California; for Defendant-Appellant.

David L. Gappa (argued), Assistant United States Attorney; Camil A. Skipper, Appellate Chief; McGregor W. Scott, United States Attorney; United States Attorney's Office, Fresno, California; for Plaintiff-Appellee.

**OPINION**

WARDLAW, Circuit Judge:

This appeal concerns the Fourth Amendment's limits on the government's use of deceit when executing a valid search warrant. Agents with the Federal Bureau of Investigation (FBI) investigating child pornography offenses obtained a warrant to search the residence of Stefan Ramirez and any vehicle registered to Ramirez located at or near the residence. Under the warrant and the law established by *Michigan v. Summers*, 452 U.S. 692 (1981), the agents had no authority to seize Ramirez or search his car when they arrived to execute the warrant, because neither was at the residence. The agents manufactured the authority to seize them by falsely claiming to be police officers responding to a burglary to lure Ramirez home.

By luring Ramirez home, the agents' successful deceit enabled them to obtain incriminating statements from Ramirez and evidence from his car and person. The district court denied Ramirez's motion to suppress the statements and evidence, and Ramirez thereafter pleaded guilty to

receipt and distribution of material involving the sexual exploitation of minors. We hold that, under the particular facts of this case, the agents' use of deceit to seize and search Ramirez violated the Fourth Amendment. Accordingly, we reverse the suppression order and remand for further proceedings.

## I.

On November 30, 2016, while conducting an undercover investigation into the file-sharing of child pornography, an FBI agent located a network user sharing suspected child pornography files on a BitTorrent file-sharing network.[1] The FBI traced the internet protocol (IP) address used to share the files to an account registered to Stefan Ramirez at a specific address on Archie Avenue (the Archie Avenue residence). In total, the agent conducted 23 separate download sessions with the Archie Avenue IP address in November and December 2016, involving over 4,000 still images and 20 videos of suspected child pornography.

The FBI conducted surveillance on the Archie Avenue residence on four occasions in February, March, and May 2017. The FBI confirmed that there were no open wi-fi networks near the Archie Avenue residence; all available networks were secured with a password. The FBI also observed a white Chrysler sedan registered to Stefan Ramirez parked in the driveway. The agents knew from experience that computers and other electronic storage

---

[1] According to the warrant application, a BitTorrent network is a publicly available peer-to-peer file-sharing network that allows a computer to share and download files from other computers.

devices potentially storing child pornography are often kept in vehicles.

Based on the foregoing, the FBI asserted there was "probable cause to believe that an individual who resides at the [Archie Avenue] residence. . . is involved in possession, receipt, and/or distribution of child pornography" and "probable cause to believe that evidence and instrumentalities of [such child pornography offenses] are located in the [Archie Avenue] residence."

The FBI, however, had not yet identified Ramirez as a suspect. Although the internet account was in Ramirez's name, several people were known to have lived at the Archie Avenue residence, any one of whom could have used Ramirez's computer to share the suspected child pornography. For example, Ramirez's mother owned the home, and a man named Andy Blanch lived there with his family at the time the FBI had the home under surveillance.

To further the investigation, Special Agent Joshua Ratzlaff applied for and obtained a warrant to search the Archie Avenue residence, including "[v]ehicles located at or near the premises that fall under the dominion and control of STEFAN RAMIREZ or any other occupant of the premises." Thus, though the warrant authorized the search of the house and car, it did not authorize the FBI to search or arrest Ramirez himself, and it permitted the FBI to search or seize Ramirez's car *only* if it was located "at or near the premises."

Agent Ratzlaff testified that the FBI hoped to speak to Ramirez when they executed the search warrant, as it was general FBI practice to interview the internet subscriber as part of the initial investigation. But Ramirez had left the house and was at work by 6:00 am that day, and the FBI did

not arrive at the house until 9:20 am.  In fact, no one was home, and the car was nowhere near.  Instead of conducting the authorized search at that point, Agent Ratzlaff concocted a ruse to lure Ramirez home: he would call Ramirez at work, claim to be a police officer investigating a burglary at the residence, and tell Ramirez he needed to return home to confirm what was taken.

Ramirez did not answer when Agent Ratzlaff first called, so the agent called one of the other known residents, Andy Blanch, and informed him of the fictional break-in.  The agents, in their fictional roles as investigating police, first asked Blanch to come to the house, but Blanch informed the agents that he and his family had moved out about three weeks earlier.  The agents then asked Blanch to notify Ramirez of the break-in.  Blanch complied and left a message on Ramirez's voicemail.  He also independently asked Ramirez's mother to go to the residence to assist the agents.  When Blanch reported back to the agents, Agent Ratzlaff concluded that Blanch likely was not involved in the child pornography offenses, and so he came clean about the true nature of their investigation.  Blanch told Agent Ratzlaff that "it was possible his fifteen-year-old stepson was involved."

Once Ramirez's mother arrived at the Archie Avenue residence, Agent Ratzlaff explained that he was not responding to a burglary but executing a search warrant in furtherance of a child pornography investigation.  Ms. Ramirez unlocked the door to allow the agents to conduct their search.  Agent Ratzlaff then asked Ms. Ramirez to call her son and to continue the ruse about the burglary so that he

would return home.[2]  Ramirez promptly began driving home after his mother informed him of the burglary, returning the missed call from the FBI on the way.  Agent Ratzlaff again identified himself as a police officer, told Ramirez there had been a burglary at his home, and said that they should wait until Ramirez arrived to discuss the matter further.

The FBI wore jackets marked "Police" (rather than FBI) and staged a Fresno police car in front of the home to elaborate upon their ruse.  The agents were armed and wore full body armor.  It was not until Ramirez parked his car and approached the agents that Agent Ratzlaff finally revealed the true purpose of their investigation, explaining that he had used the ruse to induce Ramirez to come home and to speak to him about the FBI's child pornography investigation.

After Agent Ratzlaff revealed that he had fabricated the burglary, he asked Ramirez to put his hands behind his back, placed Ramirez in a finger hold, frisked his front pockets and waistband, and seized his phone, wallet, and keys.  He then asked Ramirez if there was a private place where they could talk.  Ramirez said yes, walked with Agent Ratzlaff into the house, and chose an empty bedroom.  Ramirez's mother was in the house, but Agent Ratzlaff did not let Ramirez speak with her, saying that he needed to talk to Ramirez privately.

Agent Ratzlaff and one other agent sat across from Ramirez, with the second agent closest to the door.  The agents removed their body armor but remained armed, and they kept the door closed for the entire forty-five-minute interview.  Five other agents and two evidence technicians

---

[2] The district court held that Mrs. Ramirez acted at the behest of law enforcement when she communicated the purported burglary to her son. The Government has not challenged this finding on appeal.

continued to search the house during the interview. The agents did not tell Ramirez that he was free to leave, although Agent Ratzlaff did inform him during the interview that he was not under arrest. By the end of the interview, Ramirez had confessed to viewing child pornography on his laptop. The agents did not return Ramirez's phone, wallet, or keys until after the interview. During this time, agents also searched Ramirez's car and seized two laptops and two hard drives.

Ramirez filed a motion to suppress, arguing in relevant part that the agents unlawfully used a ruse to create the authority to seize Ramirez and his car, and that his statements, his phone, and the electronic devices taken from his car were therefore all obtained in violation of the Fourth Amendment. The district court denied the motion, concluding that the FBI had lawfully used its ruse to lure Ramirez home. Pursuant to a conditional plea agreement that preserved his right to "appeal the order denying his motion to suppress evidence . . . and any custodial sentence imposed as a result of his conviction," Ramirez then entered a guilty plea to one count of violating 18 U.S.C. § 2252(a)(2). He was sentenced to 151 months in prison followed by 60 months of supervised release.

## II.

We have jurisdiction pursuant to 28 U.S.C. § 1291. "We review a district court's denial of a motion to suppress de novo." *United States v. Washington*, 490 F.3d 765, 769 (9th Cir. 2007). "Whether an encounter between a defendant and an officer constitutes a seizure is a mixed question of law and fact that we review de novo." *Id.* "We review the trial court's factual findings, however, for clear error." *Id.*

**III.**

The agents in this case obtained the legal authority to detain Ramirez for officer safety and brought his vehicle within the scope of their search warrant by falsely claiming to be police officers investigating a burglary at Ramirez's home. Whether the district court erred by denying Ramirez's motion to suppress turns on whether the agents' use of this ruse violated the Fourth Amendment.

A.

Our review is guided by the long-standing and fundamental constitutional requirement that "no warrants shall issue, but upon probable cause, . . . and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV; *see also United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986). The Fourth Amendment's particularity requirement is not a mere technicality; it is an express constitutional command. The particularity requirement "confines an officer executing a search warrant strictly within the bounds set by the warrant." *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 394 n.7 (1971). "To the extent [government] agents want[] to seize relevant information beyond the scope of the warrant, they should [seek] a further warrant." *United States v. Sedaghaty*, 728 F.3d 885, 914 (9th Cir. 2013).

The particularity requirement serves foundational constitutional interests and must be zealously protected. "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another." *Marron v. United States*, 275 U.S. 192, 196 (1927). In addition, the particularity

requirement "assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search," *Groh v. Ramirez*, 540 U.S. 551, 561 (2004) (citation omitted), and "greatly reduces the perception of unlawful or intrusive police conduct," *Illinois v. Gates*, 462 U.S. 213, 236 (1983). To serve these ends, the particularity requirement leaves nothing "to the discretion of the officer executing the warrant." *Marron*, 275 U.S. at 196. "Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police." *McDonald v. United States*, 335 U.S. 451, 455 (1948).

Thus, a search or seizure pursuant to an otherwise valid warrant is unreasonable under the Fourth Amendment to the extent it exceeds the scope of that warrant. *Horton v. California*, 496 U.S. 128, 140 (1990); *see also United States v. Penn*, 647 F.2d 876, 882 n.7 (9th Cir. 1980) (en banc). For example, we have held that a warrant to search the main house located at a specific address does not provide a license to search a detached dwelling that is not described in the warrant. *United States v. Cannon*, 264 F.3d 875, 879–80 (9th Cir. 2001).

With this fundamental constitutional requirement in mind, we turn to the question of whether the FBI violated the Fourth Amendment by using its chosen ruse here.

B.

That the agents had a valid warrant to search the Archie Avenue residence, including vehicles located at or near the residence and registered to or accessed by Ramirez, does not end our inquiry. "An otherwise lawful seizure can violate the Fourth Amendment if it is executed in an unreasonable manner," *United States v. Alverez-Tejeda*, 491 F.3d 1013,

1016 (9th Cir. 2007) (citing *United States v. Jacobsen*, 466 U.S. 109, 124 (1984)), including if it is executed by means of an unreasonable ruse, *id.* at 1016–17 (finding the agents' "choice of guile" to effect a seizure was reasonable only because "their vital interest" in using deceit outweighed the minimal intrusion on the defendant's Fourth Amendment interests).

It has long been recognized that law enforcement may use deceit in certain circumstances. *Sorrells v. United States*, 287 U.S. 435, 441 (1932). However, not every ruse is reasonable under the Fourth Amendment. *See Lewis v. United States*, 385 U.S. 206, 209 (1966) ("The various protections of the Bill of Rights, of course, provide checks upon such official deception for the protection of the individual."); *see also Pagan-Gonzalez v. Moreno*, 919 F.3d 582, 591–92 (1st Cir. 2019) ("The right to deceive . . . is not unbounded.").

"[T]he particular circumstances of each case govern the admissibility of evidence obtained by stratagem or deception." *Lewis*, 385 U.S. at 208. The court must assess the reasonableness of law enforcement's use of deception by "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Jacobsen*, 466 U.S. at 125 (quoting *United States v. Place*, 462 U.S. 969, 703 (1983)); *Alverez-Tejeda*, 491 F.3d at 1016 ("The benchmark for the Fourth Amendment is reasonableness, which requires us to weigh the government's justification for its actions against the intrusion into the defendant's interests."). Thus, we must decide whether it was reasonable under the Fourth Amendment for the FBI to use deception in executing the

warrant in this case to expand the authorized scope of the items and persons to be searched and seized.

## C.

Although the propriety of a ruse search or seizure depends on the particular facts of each case, our precedent draws a clear line between two categories of deception. Law enforcement's use of deception is generally lawful when the chosen ruse hides the officer's identity as law enforcement and facilitates a search or seizure that is within its lawful authority, such as pursuant to a valid search warrant. Deception is unlawful when the government makes its identity as law enforcement known to the target of the ruse and exploits the target's trust and cooperation to conduct searches or seizures beyond that which is authorized by the warrant or other legal authority, such as probable cause.

Undercover operations are a classic example of permissible deception. "The fourth amendment does not afford protection to wrongdoers' misplaced confidences" in undercover agents. *United States v. Little*, 753 F.2d 1420, 1435 (9th Cir. 1984). Government agents may conceal their identities as law enforcement to "afford opportunities or facilities for the commission of [an] offense" and detect those engaged in criminal activity. *Sorrells*, 287 U.S. at 441 (finding no Fourth Amendment violation where an undercover agent posed as a tourist to ferret out a violation of prohibition laws); *see also Lewis*, 385 U.S. at 210 (finding no Fourth Amendment violation where defendant invited undercover agent into his home to buy narcotics); *United States v. Garcia*, 997 F.2d 1273, 1280 (9th Cir. 1993) (finding no Fourth Amendment violation when police officers posing as apartment hunters and speaking with occupants of an apartment saw defendant holding cocaine through screen door).

Similarly, we have found no Fourth Amendment violation when members of law enforcement conceal their identities to persuade the subject of a valid arrest warrant to open his door to facilitate the arrest. In *United States v. Michaud*, the FBI lawfully persuaded the subject of a valid arrest warrant to open her hotel door by claiming to be the hotel's assistant manager and falsely stating that her boyfriend was sick and in need of assistance. 268 F.3d 731, 733 (9th Cir. 2001). Notably, the FBI had full authority to arrest the defendant pursuant to their valid arrest warrant before they implemented their ruse, and the agents' ruse concealed their identities as law enforcement. *Id.*

Likewise, the Supreme Court found no Fourth Amendment violation where law enforcement entered property covertly and installed electronic bugging devices to effect a valid search warrant. *Dalia v. United States*, 441 U.S. 238, 248 (1979). The Supreme Court reasoned that the electronic surveillance itself was authorized by the search warrant, and there was a need for covert entry: it was the "safest and most successful method" of conducting the authorized surveillance. *Id.* at 248 & n.8.

However, when the government agent is known to the suspect as such, and invokes the trust or cooperation of an individual to search or seize items outside what is lawfully authorized, such a ruse is unreasonable under Fourth Amendment. "We take a closer look" at the reasonableness of the government's use of deception "when agents identify themselves as government officials but mislead suspects as to their purpose and authority." *Alverez-Tejeda*, 491 F.3d at 1017; *United States v. Bosse*, 898 F.2d 113, 115 (9th Cir. 1990) (explaining that "special limitations apply" in these circumstances). The balance of interests shifts significantly when the government's chosen ruse invokes the public's

trust in law enforcement because of the concern that "people 'should be able to rely on [the] representations' of government officials." *Alverez-Tejeda*, 491 F.3d at 1017 (quoting *Bosse*, 898 F.2d at 115).

"This concern is at its zenith when government officials lie in order to gain access to places and things they would otherwise have no legal authority to reach." *Id.* "We think it clearly improper for a government agent to gain access to [places and things] which *would otherwise be unavailable to him* by invoking the private individual's trust in his government." *Id.* at 1017 (quoting *Bosse*, 898 F.2d at 115)). That is, government agents violate the Fourth Amendment if their authority to access the evidence in question was obtained by "misrepresenting the scope, nature or purpose of a government investigation." *Bosse*, 898 F.2d at 115. "[A]ccess gained by a government agent, *known to be such by the person with whom the agent is dealing*, violates the fourth amendment's bar against unreasonable searches and seizures if such entry was acquired by affirmative or deliberate misrepresentation of the nature of the government's investigation." *Little*, 753 F.2d at 1438 (emphasis added). As the Fifth Circuit has said:

> [A] private person has the right to expect that the government, when acting in its own name, will behave honorably. When a government agent presents himself to a private individual, and seeks that individual's cooperation based on his status as a government agent, the individual should be able to rely on the agent's representations. We think it clearly improper for a government agent to gain access to records which would otherwise be unavailable to him

> by invoking the private individual's trust in
> his government, only to betray that trust.

*SEC v. ESM Gov't Sec., Inc.*, 645 F.2d 310, 316 (5th Cir. 1981).

Thus, we held in *United States v. Phillips* that federal agents violated the Fourth Amendment by using a ruse to execute an arrest. 497 F.2d 1131, 1136 (9th Cir. 1974). In *Phillips*, we assumed the agents had probable cause to arrest the defendant, *id.* at 1133, but found that the agents did not have authority to enter the defendant's office building to effect his arrest because they lacked probable cause to think he would be inside, *id.* at 1136. The agents concocted a ruse to fill this gap in their authority: the agents directed uniformed police officers to knock on the building door and ask another occupant for "permission to enter to investigate a report of a burglary in the building," even though there was no such report. *Id.* at 1133. After the uniformed officers obtained "consent" to enter, the agents followed them inside and arrested the defendant. *Id.* The defendant's arrest violated the Fourth Amendment because the ruse could not create the authority to access the building the officers did not already possess, particularly because the agents revealed their status as law enforcement and misrepresented the purpose of their investigation. *See id.* at 1135 & n.4; *Bosse*, 898 F.2d at 115 (discussing *Phillips* and explaining that this type of misrepresentation invalidates consent).

Law enforcement does not have carte blanche to use deception to effect a search and seizure. A ruse that reveals the officers' identity as law enforcement but misrepresents the purpose of their investigation so that the officers can evade limitations on their authority raises serious Fourth Amendment concerns.

D.

Under these well-established principles, the ruse used here was not a permissible means to effect the search and seizure of Ramirez. The FBI agents posed as police officers and played on Ramirez's trust and reliance on their story that his home had been burglarized to bring Ramirez and his car within the ambit of the warrant, when they were not otherwise within its ambit. The FBI had no acceptable government interest in using this ruse. Thus, balancing the strong Fourth Amendment interest against the non-existent government interest, the FBI's conduct was plainly unreasonable under the Fourth Amendment.

1.

The Fourth Amendment interest in this case is near its zenith because the agents' chosen ruse both revealed the agents' identities as law enforcement and created authority to search items and seize Ramirez that otherwise exceeded the strict bounds of the warrant. *See Alverez-Tejeda*, 491 F.3d at 1017.

The search warrant gave the FBI only limited authority to conduct searches and seizures. The warrant authorized the agents to search the Archie Avenue residence, where Ramirez and others were known to reside, and any vehicles located at or near the premises that fall under the dominion and control of Ramirez or any other occupant of the premises. By the plain terms of the warrant, the agents had no authority to search any vehicle located away from the residence.

The warrant did not authorize the agents to seize Ramirez, and the Government does not argue that it had

reasonable suspicion or probable cause to do so.[3]  In fact, the
Government concedes that at the time the agents seized
Ramirez, the agents knew only that child pornography had
been shared from the Archie Avenue residence; it did not
know who was responsible.  The Government conceded at
oral argument that the agents' authority to pat down Ramirez
when he arrived home rested solely on the *Summers* rule,
which permits officers executing a valid search warrant to
detain occupants within the immediate vicinity of the
premises during the search.  *See Bailey v. United States*,
568 U.S. 186, 195–96 (2013) (discussing *Summers*, 452 U.S.
at 702–03).  "Immediate vicinity" is narrowly defined.  In
*Bailey*, for example, the Supreme Court held that the officers
violated the *Summers* rule by detaining a defendant who had
"left the apartment before the search began," and "wait[ing]
to detain him until he was almost a mile away."  *Bailey*,
568 U.S. at 194, 201.  Thus, as with Ramirez's car, the FBI's
authority to seize Ramirez depended on his presence at the
residence.

In short, because Ramirez and his car were not located at
the Archie Avenue residence when the FBI arrived to
execute their search warrant, they fell outside the scope of
the warrant.  The FBI therefore lacked the legal authority to
seize them when they arrived to execute the warrant, before
they employed their deliberate ruse.  *See Bivens*, 403 U.S.
at 394 n.7 (stating "an officer executing a search warrant [is
confined] strictly within the bounds set by the warrant").  It

---

[3] Our dissenting colleague opines that the FBI had reasonable
suspicion to seize Ramirez, Dissent at 44 n.4, but the Government
waived that argument by failing to raise it in its answering brief.  *See
United States v. McEnry*, 659 F.3d 893, 902 (9th Cir. 2011) (when the
government does not make an argument that "was available at the time
it filed its answering brief . . . [it] has waived that argument.").

was only by posing as police officers investigating a fictitious home burglary that the agents convinced Ramirez to drive home, thereby creating the authority to seize him and his car that did not otherwise exist at the time.

The dissent takes the position that, because the agents *would have* had authority to seize Ramirez and his car had Ramirez voluntarily returned home when the agents were executing the warrant, the agent's use of deceit was lawful. But this is not what happened. The agents chose not to wait and see if Ramirez returned home of his own accord. It matters not that the FBI might have been able to search Ramirez's car or speak with him had they used a different method. As we explained in a ruse entry case in which the homeowner admitted "she would have invited [the detective] into her home even if she had known" the true nature of his investigation, "[i]t is entirely immaterial that [the detective] could have lawfully searched [the owner's] home by securing her consent without using a ruse." *Whalen v. McMullen*, 907 F.3d 1139, 1148 (9th Cir. 2018). We are concerned here with whether the agents' *actual* conduct was constitutional.

When we return from our dissenting colleague's hypothetical world to what actually happened, it is clear that the agents *did not* have authority to seize Ramirez or his car because both were at his office and not on the premises to be searched. If the agents wanted to seize Ramirez or his car under their existing warrant, they could have waited for Ramirez to return voluntarily or executed the warrant at a different time. Or, having ruled out the tenant Blanch and Ramirez's mother as suspects, they could have sought a warrant based on probable cause to arrest Ramirez or search his car elsewhere. *See Sedaghaty*, 728 F.3d at 914 ("To the extent [government] agents want[] to seize relevant

information beyond the scope of the warrant, they should [seek] a further warrant."). The FBI agents did none of these things. Instead, the agents lied about their identity and the purpose of the investigation to fill the gaps in their authority.

Permitting the agents' conduct would eviscerate the limitations implemented by the *Summers* rule, allowing law enforcement to seize people located away from the premises to be searched. "Conducting a *Summers* seizure incident to the execution of a warrant is not the Government's right; it is an exception—justified by necessity—to a rule that would otherwise render the [seizure] unlawful." *Bailey*, 568 U.S. at 204 (Scalia, J., concurring) (internal quotations omitted). It also risks subverting the particularity requirements of the Fourth Amendment in future cases. Law enforcement could turn a warrant to search a home into a warrant to search any number of items outside the home, so long as they could trick a resident into bringing those items to the home to be searched before the warrant was executed. The deceit employed in this case opens a loophole that the Fourth Amendment does not condone.

To make matters worse, the FBI's chosen ruse invoked Ramirez's trust in the government and "introduce[d] an extraneous factor," a burglary that Agent Ratzlaff refused to discuss over the phone, which was "calculated to make it falsely appear that [it] . . . was essential" for Ramirez to return home. *See* 4 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 8.2(n) & n.424 (5th ed. 2012 & Supp. 2019). Our cases make clear that a suspect's Fourth Amendment interests are at their zenith where, like here, "government officials lie in order to gain access to . . . things they would otherwise have no legal authority to reach." *Alverez-Tejeda*, 491 F.3d at 1017.

2.

In contrast to the strong Fourth Amendment interests implicated in this case, the Government's purported interest in luring Ramirez home to speak with him is illusory. The agents' two stated justifications for using the ruse to secure Ramirez and his car's presence on the premises were that (1) they did not want to breach the front door, which would inhibit future cooperation, and (2) they wanted to talk to the subscriber of the internet account, whom they knew was Ramirez. Neither is sufficient to countervail the Fourth Amendment interests at stake.

The FBI did not need the ruse to avoid breaking down doors because Ramirez's mother arrived shortly after they did and, despite having had the truth of the agents' investigation revealed to her, she unlocked the front door for the agents. Yet the ruse continued. Even after the door had been opened for the agents by Ms. Ramirez, when the FBI received a call from Ramirez, who was on the way to what he thought was his burglarized home, the agents did not reveal the truth to him.

As for the agents' second stated interest in the ruse—that they wanted to speak with the internet subscriber as part of their initial investigation—they could have spoken with Ramirez at any time without undertaking this elaborate ruse to bring him to his house at the same time they were executing the warrant. The only possible reasons for their chosen conduct were (1) to seize Ramirez under *Summers*, and (2) to secure the car at the residence so they could then purport to lawfully search it under the warrant. Assuming the agents saw some efficacy in speaking to Ramirez specifically at his residence, the Government articulates no reason why the agents could not have simply waited to execute the warrant until Ramirez returned home of his own

accord, or waited to approach Ramirez at a different time or on a different day entirely.  Agent Ratzlaff testified that he "didn't believe [the evidence] was going anywhere," so there was no need to speed up the process.  We have never recognized inconvenience or impatience as justification for exceeding the scope of a lawfully issued warrant.  *See Bailey*, 568 U.S. at 199; *McDonald*, 335 U.S. at 455 ("[I]nconvenience of the officers and delay in preparing papers and getting before a magistrate . . . are no justification for by-passing the constitutional requirement.").

Thus, there is *no* governmental interest justifying the ruse here, because neither stated justification is factually supported.  The absence of any governmental interest places this case in stark contrast with *Alverez-Tejeda*, where the government had a "vital interest" in using the ruse.  491 F.3d at 1017.  In *Alverez-Tejeda*, federal agents investigating a drug conspiracy staged a carjacking to seize the appellant's car, which they had probable cause to believe he was using to transport illicit drugs.  *Id.* at 1015.  The concern that "government officials [will] lie in order to gain access to places and things they would otherwise have no legal authority to reach" was not present; it was undisputed that the officers there had full authority to seize the car and arrest the appellant before the ruse was implemented.  *Id.* at 1016–17.  The government also had a "vital interest" in using a ruse to avoid tipping off the appellant's co-conspirators about their investigation.  *Id.* at 1017–18.  In these circumstances, we held there was nothing "unreasonable in the agents' choice of guile to seize the car, rather than taking it outright, as they were entitled to do."  *Id.* at 1017.

For the same reason, the Government's reliance on the non-binding case *United States v. Harris*, 961 F. Supp. 1127

(S.D. Ohio 1997), is misplaced.**[4]**   In *Harris*, the court approved of a ruse that was "reasonable . . . [and] necessary for the protection of the officers." *Id.* at 1133.   Police officers obtained a warrant to search the defendant's home after learning that he had ordered and received vials of the bacteria that caused the bubonic plague. *Id.* at 1129.   The officers "lured [the defendant] out of his residence by telling him his car had been involved in a hit-skip accident," walked the defendant to his car, and handcuffed him. *Id.* at 1130. The defendant was already present at the premises to be searched when the officers employed their ruse, so there was no concern that the ruse enabled the officers to expand their authority by circumventing the *Summers* rule.   The court found that the ruse was minimally intrusive because the officers had a valid warrant to enter the defendant's home and the ruse lasted only a few moments. *Id.* at 1133.   In addition, the ruse and the defendant's detention were "necessary for the protection of the officers" because they were facing a "new situation" involving "a potentially deadly pathogen." *Id.*   Thus, the ruse served not to expand the officers' authority but only to ensure the officers' safe entry to the premises to be searched.

In short, the seizures-by-ruse in *Alverez-Tejeda* and *Harris* were permissible because the government had full and actual legal authority to seize the evidence at issue before implementing their ruse, and a strong governmental

---

**[4]** The other case cited by the Government, *United States v. Smith*, 919 F.3d 1, 10 (1st Cir. 2019), is of no help because the First Circuit assumed, without deciding, that a constitutional violation occurred when government agents used a ruse to gain access to the defendant's property.

interest justified those chosen ruses.  Neither is true in this case.[5]

3.

Balancing the Government's justification for its actions against the intrusion into the defendant's Fourth Amendment interests,   the   Government's   conduct   was   clearly unreasonable. The Fourth Amendment interest is near its zenith in this case because the agents betrayed Ramirez's trust in law enforcement in order to conduct searches and seizures beyond what they were lawfully authorized to do. Ramirez and his car were away from the residence when the agents arrived to execute the search warrant.  Thus, under

---

[5] The cases cited by the dissent are likewise distinguishable.  Several hold that law enforcement may use a ruse to persuade an arrestee to open the door in order to execute a valid arrest warrant—a point that is not at issue in this case and that does not conflict with the *Summers* rule.  *See Michaud*, 268 F.3d at 733; *see also United States v. Alejandro*, 368 F.3d 130, 131, 137 (2d Cir. 2004); *State v. Bentley*, 975 P.2d 785, 788 (Idaho 1999).

The others involve a ruse used to execute a search warrant where there was a strong governmental interest in using the ruse to safely gain entry onto the property, or the ruse played no role in gaining authority to access the thing to be searched.  *See United States v. Vargas*, 621 F.2d 54, 56–57 (2d Cir. 1980) (the ruse-entry, in addition to being unnecessary to obtain authority to enter the home to be searched, was justified, "[g]iven the huge amount of pure cocaine known to be in the apartment and the presence of innocent children[,] . . . to avoid a possible resort to violence");  *State v. Myers*, 689 P.2d 38, 40–43 (Wash. 1984) (the ruse-entry, in addition to being unnecessary to obtain authority to enter the home to be searched, was justified because the front door was protected by a cast iron grill and the defendant was known to answer the door in possession of a handgun); *Coleman v. United States*, 728 A.2d 1230, 1236–37 (D.C. 1999) (the ruse-entry was permissible where the officers had a warrant that "gave them the authority to enter and search the house regardless of the consent or non-consent of anyone inside").

the *Summers* rule and due to the limited scope of the warrant, the agents had no authority to seize Ramirez or his car at the time in question. The agents nevertheless proceeded to identify themselves as law enforcement and misrepresent the purpose of their investigation to effect these seizures. There is no supportable government interest to tip the other side of the scale. The agents identified no acceptable justification for using a ruse to lure Ramirez home. In these circumstances, the deceit employed by the agents violated the Fourth Amendment.

## IV.

### A.

The Government argues that there was no Fourth Amendment violation because the agents never seized Ramirez. Not so. The agents unquestionably seized Ramirez after luring him back to the Archie Avenue residence, when they placed him in a finger hold, frisked him, and removed his phone, wallet, and keys. *Terry v. Ohio*, 392 U.S. 1, 19 (1968). There is also no debate that the agents seized electronic devices from Ramirez's car.

Both of these seizures were unconstitutional as they were the direct result of the FBI agents' unreasonable ruse. Ramirez and his car were at the residence, and consequently within the scope of the warrant and the *Summers* rule, only because of the unjustified ruse. Because the FBI obtained Ramirez's phone, wallet, keys, and the electronic devices in Ramirez's car as a product of these unlawful seizures, that evidence is tainted by the prior illegality and thus inadmissible. *See Wong Sun*, 371 U.S. at 488; *United States v. Landeros*, 913 F.3d 862, 870 (9th Cir. 2019) (excluding evidence seized from unlawful pat down).

B.

We must next determine whether Ramirez's statements, made after Agent Ratzlaff revealed the true purpose of the investigation and asked to speak with him, should be suppressed because they were tainted by the illegality of the initial seizure.[6]

"It is well established that, under the 'fruits of the poisonous tree' doctrine, evidence obtained subsequent to a violation of the Fourth Amendment is tainted by the illegality and is inadmissible, despite a person's voluntary consent, unless the evidence obtained was 'purged of the primary taint.'" *Washington*, 490 F.3d at 774 (quoting *Wong Sun*, 371 U.S. at 488). "The test for admissibility of the evidence under these circumstances is two-fold: not only must the consent be voluntary, but it must also be 'sufficiently an act of free will to purge the primary taint'" of the initial constitutional violation. *Id.* at 774 (quoting *Wong Sun*, 371 U.S. at 466); *United States v. Bocharnikov*, 966 F.3d 1000, 1004 (9th Cir. 2020) ("[W]hen a confession results from certain types of Fourth Amendment violations . . . , the government must go beyond showing that the confession was voluntary—it must also 'show a sufficient break in events to undermine the inference that the confession was caused by the Fourth Amendment violation.'" (quoting *Oregon v. Elstad*, 470 U.S. 298, 306 (1985))).

Ramirez's statements, even if made voluntarily, are inadmissible if they were obtained through "exploitation of illegality," here, the use of the ruse to circumvent the

---

[6] The district court did not separately analyze this question because it erroneously determined that the ruse was lawful.

*Summers* rule and unlawfully seize Ramirez, *supra* IV.A, and not "by means sufficiently distinguishable to be purged of the primary taint." *See Wong Sun*, 371 U.S. at 488; *see also Washington*, 490 F.3d at 774. Three factors are relevant to assessing this causal connection: "temporal proximity," "the presence of intervening circumstances," and "the purpose and flagrancy of the official misconduct." *Washington*, 490 F.3d at 776 (quotation marks omitted) (quoting *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)); *see also Dunaway v. New York*, 442 U.S. 200, 218 (1979). The government has the burden of showing the taint of the constitutional violation is attenuated such that the evidence is admissible. *Washington*, 490 F.3d at 777.

In *United States v. Johnson*, in relevant part, the government arrested the defendant without a warrant in violation of the Fourth Amendment when the defendant, standing inside his home, opened his door to two agents who had misrepresented their identities and had their guns drawn. 626 F.2d 753, 755, 757 (9th Cir. 1980). We held that the defendant's subsequent statements, made in his bedroom ten minutes after this arrest, were "obtained by exploitation of the illegality of his arrest" and should have been suppressed. *Id.* at 758–59 (quoting *Dunaway*, 442 U.S. at 217). We reasoned that both temporal proximity and the absence of any intervening circumstances supported this conclusion, *id.* at 759, even though—as in Ramirez's case—the statements were made *after* the agents revealed their true identities and holstered their weapons, and even though the defendant had *agreed* to speak with them, *id.* at 755. The mere minutes between the defendant's illegal detention and his incriminating statements made "the close causal relationship" undeniable, notwithstanding the agents' decision to come clean and the absence of particularly purposeful or flagrant misconduct. *Id.* at 759.

*Johnson*'s analysis of the *Dunaway/Brown* doctrine controls here.   Within a mere forty-five minutes of successfully executing their unlawful ruse, the agents obtained Ramirez's confession.  There was no meaningful break or intervening event between the unlawful use of the ruse to effect Ramirez's seizure and his incriminating statements.  *See Johnson*, 626 F.2d at 758–59 (concluding Johnson's confession was tainted because it "was made within ten minutes after the entry and . . . '[n]o intervening events broke the connection between petitioner's illegal detention and the confession.'").  Moreover, the purpose and flagrancy of the misconduct weighs in favor of suppression, as the Government plainly used its unlawful ruse to circumvent *Summers* and the Fourth Amendment's particularity requirement.  *See Dunaway*, 442 U.S. at 218 (noting the "quality of purposefulness" of the primary illegality weighed in favor of suppression).   The Government has not shown that Ramirez's statements were "sufficiently an act of free will to purge the primary taint" of his unlawful seizure.  *See Wong Sun*, 371 U.S. at 486; *see also Johnson*, 626 F.2d at 758–59 (suppressing a statement given ten minutes after unlawful seizure, with no intervening circumstances); *Washington*, 490 F.3d at 777 (holding consent did not purge the taint of an illegal seizure where the officer "requested . . . consent . . . immediately after he conducted a search of [the defendant's] person, and while [the defendant] was illegally seized," and there were no "intervening circumstances.").

The dissent attempts to undercut the causal connection between Ramirez's illegal seizure—effected by the unlawful ruse—and Ramirez's subsequent inculpatory statements by suggesting that the "result might have been different had Ramirez remained seized" at the time the statements were made.  Dissent at 45, 46.  The dissent misapprehends the

controlling Fourth Amendment precedent.  No requirement exists that a defendant *remain* seized following an illegal seizure for the defendant's subsequent statements to be deemed tainted by the illegal seizure.  Recently, in *Bocharnikov*, for example, officers went to Bocharnikov's home after he pointed a laser at a police aircraft.  966 F.3d at 1001.  The officers illegally detained Bocharnikov, interrogated him, and obtained a confession.  *Id.* at 1002.  Eight months later, an agent returned to Bocharnikov's home to ask "follow-up" questions, and Bocharnikov again made incriminating statements.  *Id.*  Although Bocharnikov was not seized when he made this second set of statements, we applied the *Brown* factors to hold that the district court erred by not suppressing those statements because they were not "sufficiently attenuated from the illegal detention and seizure eight months prior."  *Id.* at 1006.

It is well established that to demonstrate that the statements were sufficiently attenuated, the government must prove that the statements were (1) voluntary, and (2) untainted by the illegal seizure.  *See Bocharnikov*, 966 F.3d at 1004; *Washington*, 490 F.3d at 774.  Notably, the dissent's attenuation analysis is largely limited to the voluntariness inquiry—in which a defendant's continued seizure is just one factor.  *See Washington*, 490 F.3d at 775 (identifying "whether defendant was in custody" as one of five factors to consider in determining whether "consent to search was voluntarily given").  While we maintain serious concerns that consent was not voluntary here,[7] we

---

[7] In *Washington*, we stated that consent provided at a time when a reasonable person would "not have felt free to terminate the encounter and leave . . . raises grave questions" as to whether that consent can be considered voluntary.  490 F.3d at 775–76.  We share similar concerns regarding voluntariness here.  Ramirez returned home not to voluntarily

emphasize that our conclusion does not hinge on this determination and is instead rooted in our finding that the Government failed to carry its burden to show that Ramirez's incriminating statements were not obtained through "exploitation of illegality"—the use of the ruse to circumvent the *Summers* rule and unlawfully seize Ramirez— rather than "by means sufficiently distinguishable to be purged of the primary taint." *See Wong Sun*, 371 U.S. at 488.

---

speak with the agents about their child pornography investigation, but because he believed that his house had been burglarized. *See Johnson*, 626 F.2d at 757 (holding the defendant's "initial exposure" to government agents was not consensual or voluntary where he opened his door to agents who misrepresented their identities). He agreed to speak to the agents only after he was unlawfully seized, as explained above, by being placed in a finger hold with his fingers behind his back.

Moreover, although we need not reach the issue of whether Ramirez remained "seized" during the interview, Ramirez makes a compelling argument that his seizure continued even after the officer safety search had been completed. The armed agents, who outnumbered him seven to one, had impeded his realistic means of leaving the scene by taking his phone, wallet, and keys. *See Washington*, 490 F.3d at 773; *see also Royer*, 460 U.S. at 501, 503; *United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997). And although Agent Ratzlaff informed Ramirez that he was not under arrest during the interview, no agent "informed [Ramirez] of his right to terminate the encounter" at any time, and Agent Ratzlaff affirmatively prevented Ramirez from speaking to his mother, all of which weigh in favor of finding a seizure. *Washington*, 490 F.3d at 772.

Despite these concerns, we need not decide the issue of voluntariness because we conclude that Ramirez's statements were tainted by the unconstitutionality of his initial seizure.

## V.

The district court erred by denying the motion to suppress Ramirez's phone, wallet, keys, electronic equipment, and statements.  Because we reverse the denial of the motion to suppress on Fourth Amendment grounds, we do not reach Ramirez's Fifth Amendment argument or the propriety of his special conditions of release.  We also need not reach Ramirez's challenge to the district court's restitution order, as Ramirez concedes the issue is now moot.  For this same reason, we deny without prejudice the Government's motion to supplement the record with documents demonstrating mootness.

## **REVERSED AND REMANDED.**

---

COLLINS, Circuit Judge, dissenting:

Defendant Stefan Ramirez was convicted of distribution of child pornography in violation of 18 U.S.C. § 2252(a)(2) and sentenced to 151 months in prison and five years of supervised release.  In sentencing Ramirez, the then-Chief Judge of the district court stated that, in nearly 20 years of federal judicial service, he had never had a child-pornography case worse than this one:

> I mean we are talking in this case about the attempted rape of a two- or three-year-old child.  We are talking about tying up a nine-year-old and having a dog do things to her.  We are talking about things that are just, beyond description, horrid.
>
> . . .

> I truly meant it when I said that I have not seen a group of photos that were more violative of the decency of humanity than these. The faces on several of the children said it all. The fear. The pain.

Today, however, Ramirez escapes justice based on a wholly illusory Fourth Amendment violation. Here, a magistrate judge specifically found probable cause to search *Ramirez's car* for child pornography and therefore granted a search warrant that expressly authorized a search of that car while it was at Ramirez's residence. The majority nonetheless holds that the agents executing the search warrant violated the Fourth Amendment because, rather than waiting until Ramirez and his car were home before executing the search warrant, the lead FBI agent used a ruse to get Ramirez to return to the house with his car during the search. The majority therefore suppresses the electronic devices loaded with child pornography that were found in Ramirez's car, as well as the incriminating statements that Ramirez made after his return. In so doing, the majority seriously errs.

Contrary to what the majority suggests, the core Fourth Amendment requirements of probable cause and a particularized warrant *were* satisfied with respect to a search of Ramirez's car for child pornography, because the warrant application specifically explained why there was probable cause to believe that the sought-for electronic devices would be found in the car and the magistrate judge expressly granted the requested authority to search Ramirez's car. Because (for reasons that are unclear) the FBI only requested a warrant to search the car *while* it was at Ramirez's house, the agent's subsequent use of the ruse only affected the manner in which the search fulfilled *that* condition of the

warrant, which is not one that was required by the Fourth Amendment.    To search Ramirez's car, as expressly contemplated by the warrant, the FBI either had to wait for Ramirez to come home or the FBI had to find a way to get him to return to the house.  The majority is quite wrong in conjuring a constitutional difference between these two choices in the circumstances of this case.  The result would be different if the ruse had been used to bring within the literal scope of the warrant some item that was wholly outside the contemplation of the warrant application—*that* would have operated as a clear evasion of the constitutional requirements of a determination of probable cause by a neutral magistrate who then grants a warrant authorizing the search of that particular item.  But that is not at all what happened here.  The agents instead found exactly what they were looking for in exactly the vehicle they had been granted permission to search based on an undisputed showing of probable cause.  Far from being "near its zenith," Ramirez's "Fourth Amendment interest" in the particular *manner* in which the search warrant was executed here is insubstantial. *Cf*. Maj. Opin. at 17, 24.

The majority further errs in holding that the inculpatory statements made by Ramirez must be suppressed as fruits of an unconstitutional seizure of Ramirez that resulted from the supposedly wrongful ruse.  Even assuming *arguendo* that the brief initial pat-down of Ramirez was an unconstitutional seizure, Ramirez's subsequent confession was in no sense a fruit of that momentary frisk.  And I agree with the district court that Ramirez was not seized during his subsequent interview with two FBI agents that was conducted in his own home, and so his confession cannot be suppressed on the theory that it was a fruit of any such alleged seizure.

I respectfully dissent.

# I

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and its Warrant Clause further specifically provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.  Here, all of the requirements of the Warrant Clause were clearly satisfied with respect to a search of Ramirez's car for child pornography.  Moreover, the manner in which the search of the car was conducted was not "unreasonable," despite the FBI agents' use of deception in carrying it out.  Accordingly, there was no violation of the Fourth Amendment in the search of Ramirez's car and no basis to suppress the evidence seized from it.

# A

An FBI agent submitted a warrant application that set forth detailed and specific facts establishing probable cause to believe that child pornography was being shared electronically through an IP address registered to Ramirez at his home.  The application further expressly stated that, given the portability of many electronic devices today, "these devices are often stored in vehicles to prevent other users in the home from discovering the existence of a child pornography collection," and the application therefore sought specific "permission to search vehicles located at or near the premises that fall under the dominion and control of the person or persons associated with the premises."  The application further described a "white Chrysler sedan" with a specified California license plate as being registered to Ramirez and as being "operated on a regular basis" from Ramirez's home.  The agent who authored the affidavit

subscribed and swore to it before a magistrate judge who, after reviewing the application, found probable cause to believe that child pornography would be found in Ramirez's house *and* his car.    The magistrate judge therefore specifically authorized a search, not just of Ramirez's house, but of "any vehicles registered to or accessed by Stefan Ramirez," and the warrant authorized the seizure of, *inter alia*, any "[c]omputers or storage media" used to share or store child pornography.[1]    After Ramirez returned home with his white Chrysler sedan as a result of the agents' ruse, the agents searched the vehicle pursuant to the warrant and found in the vehicle four devices containing child pornography (*viz.*, two laptops and two hard drives).  These were the *only* four items seized during the search; no child pornography was found in the house itself.

On these undisputed facts, there can be no denying that a "neutral and detached magistrate had found probable cause" to believe (1) that the law was being violated in Ramirez's house and (2) that evidence of such violations might be found in that house *and* in Ramirez's car. *Michigan v. Summers*, 452 U.S. 692, 701 (1981).    The facts demonstrating such probable cause were "supported by Oath," *see* U.S. Const. amend. IV, and those facts specifically established probable cause to search *Ramirez's white Chrysler sedan*.  Moreover, the warrant issued by the

---

[1] Although the actual warrant does not explicitly replicate the warrant application's limitation that the vehicles to be searched must be "located at or near the premises," all parties have construed the warrant as implicitly containing such a limitation.  And although the warrant could arguably be read as also authorizing the search of vehicles under the control of "any *other* occupant of the premises," no such issue is presented here because no one else's vehicle was searched.  Accordingly, I construe the warrant as extending only to vehicles registered to, or accessed by, Ramirez and that are located at or near his home.

magistrate judge particularly "describ[ed] the place to be searched" as including Ramirez's car at his house, and it likewise specifically described the "things to be seized" as including laptops and hard drives containing child pornography. *See id.* Because probable cause had been shown, based on sworn-to facts, to specifically justify searching Ramirez's white Chrysler sedan and because a magistrate judge issued a warrant particularly authorizing a search of *that* car at Ramirez's house as well as the seizure of laptops and hard drives from it, the FBI's search in this case satisfied every aspect of the Warrant Clause.

**B**

Even if the requirements of the Warrant Clause are satisfied, however, the Fourth Amendment still further requires that a search must not be "unreasonable." *See* U.S. Const. amend. IV. The majority concludes that the search here was unreasonable because the FBI's use of deception in getting Ramirez to return home with his white Chrysler sedan supposedly "expand[ed] the authorized scope of the items and persons to be searched and seized." *See* Maj. Opin. at 12–13. This holding misreads both our precedent and the record in this case.

As the majority notes, *see* Maj. Opin. at 13–14, we have held that, while officers may properly conceal their law-enforcement status in conducting undercover work, *see Lewis v. United States*, 385 U.S. 206, 208–09 (1966), it is quite another matter for them to *reveal* themselves to be government agents and then to "obtain[] entry [to property] by misrepresenting the scope, nature, or purpose of a government investigation," *United States v. Bosse*, 898 F.2d 113, 115 (9th Cir. 1990). Recognizing the "[s]pecial limitations," *id.*, that apply in the latter situation, we have long held that it is "'clearly improper for a government agent

to gain access to [property] which *would otherwise be unavailable to him* by invoking the private individual's trust in his government,'" *United States v. Alverez-Tejeda*, 491 F.3d 1013, 1017 (9th Cir. 2007) (quoting *Bosse*, 898 F.2d at 115) (further citation omitted). We have repeatedly applied this principle to invalidate "consent" searches of otherwise-unavailable property when a known government officer obtained that consent by misrepresenting his or her governmental purpose. *See Whalen v. McMullen*, 907 F.3d 1139, 1147–48 (9th Cir. 2018); *Bosse*, 898 F.2d at 115; *see also United States v. Robson*, 477 F.2d 13, 17 (9th Cir. 1973) ("It is a well established rule in this and other circuits that a consent search is unreasonable under the Fourth Amendment if the consent was induced by the deceit, trickery or misrepresentation of the Internal Revenue agent."). Contrary to what the majority contends, *see* Maj. Opin. at 17–24, this principle has no application here because the ruse employed in this case did *not* have the effect of allowing the agents "to gain access to places and things they would otherwise have no legal authority to reach." *Alverez-Tejeda*, 491 F.3d at 1017.

Unlike the cases in which we have found a violation of this principle, the agents here did not use the ruse to evade the Fourth Amendment requirements to show probable cause and to obtain a warrant authorizing the seizure of specified items from a particular place. In both *Bosse* and *Whalen*, for example, we held that the ruses were impermissible because the officers had failed to satisfy the core Fourth Amendment requirements of a warrant and probable cause and were relying *solely* upon the ostensible authority obtained from a fraudulently-induced consent to government entry. *See Whalen*, 907 F.3d at 1144 (agent investigating defendant for disability-benefits fraud was only admitted to suspect's house after falsely telling her that he was investigating an

identity-theft ring in the area); *Bosse*, 898 F.2d at 114 (ATF agent accompanied state firearms licensing officer on consent inspection of defendant's house without identifying himself).  In sharp contrast, the FBI agent here did make the necessary sworn showing of probable cause to obtain a warrant to search Ramirez's white Chrysler sedan for devices containing child pornography, and therefore that specific car was within the FBI's "legal authority to reach." *Alverez-Tejeda*, 491 F.3d at 1017.  The evasion of Fourth Amendment requirements that was the basis of our rulings in *Bosse* and *Whelan* is thus absent here.

The majority notes that the warrant here only allowed the search of Ramirez's car to take place while the vehicle was at Ramirez's home, *see* Maj. Opin. at 17, but that fact provides no basis for finding an evasion of Fourth Amendment requirements.  This feature of the warrant effectively imposed a limitation on the *manner* in which the authorized search of Ramirez's car could be conducted, and here the FBI agents used the ruse to *comply* with that manner-of-execution restriction.  Nothing about that limitation, or the manner of the agents' compliance with it, detracts from the fact that the agents had done everything the Fourth Amendment requires to secure explicit legal authority to search *that* particular vehicle for the items that were seized from it.  Indeed, the majority concedes that the agents could have searched Ramirez's car "under their existing warrant" simply by "wait[ing] for Ramirez to return voluntarily or execut[ing] the warrant at a different time," *see id*. at 19, but the majority nonetheless concludes that the Fourth Amendment was violated simply because, rather than waiting, the agents tricked Ramirez into coming home early, *see id*. at 23–24.  The majority, however, is unable to cite a single case in which this court has ever condemned the use of deception to *facilitate* the successful execution of a valid

warrant to search or seize the very thing or person specified in the warrant. On the contrary, both this court and other courts have broadly held that the Fourth Amendment does not forbid the use of a ruse in carrying out an otherwise valid search. *See*, *e.g.*, *United States v. Michaud*, 268 F.3d 728, 733 (9th Cir. 2001) ("'There is no constitutional mandate forbidding the use of deception in executing a valid arrest warrant.'" (quoting *Leahy v. United States*, 272 F.2d 487, 490 (9th Cir. 1959))); *see also United States v. Alejandro*, 368 F.3d 130, 137–38 (2d Cir. 2004) ("'[A] ruse in execution of a search warrant violates neither [18 U.S.C.] § 3109'"— which addresses the manner of executing search warrants— "'nor the Fourth Amendment.'" (citation omitted)); *United States v. Vargas*, 621 F.2d 54, 56–57 (2d Cir. 1980) ("The use of a ruse by the agents to gain admission . . . after the issuance of the warrant was fully justified."); *State v. Bentley*, 975 P.2d 785, 786, 788 (Idaho 1999) (no Fourth Amendment violation where, in order to execute warrant that authorized defendant's arrest only "in a public place but not in his home," officers arrived at defendant's home and lured him outside by lying about what they were investigating); *Coleman v. United States*, 728 A.2d 1230, 1236–37 (D.C. 1999) (distinguishing *Bosse* and other cases, and finding no Fourth Amendment violation where officers gained entry to execute a search warrant by falsely stating that they were investigating a burglary); *State v. Myers*, 689 P.2d 38, 40– 43 (Wash. 1984) (no Fourth Amendment violation where, in gaining access to execute narcotics search warrant, officers falsely claimed to have a traffic arrest warrant for defendant), *overruled on other grounds*, *State v. Lively*, 921 P.2d 1035, 1045 (Wash. 1996).

The majority's only response to these cases is to distinguish them on their specific facts, *see* Maj. Opin. at 23–24 n.5, but that does nothing to avoid their

reasoning—which cannot be reconciled with the majority's novel ruling. In particular, the Idaho Supreme Court's decision in *Bentley* is flatly contrary to the majority's holding here. In *Bentley*, as in this case, the warrant carried a restriction on its execution that was not required by the Fourth Amendment. The arrest warrant in *Bentley* could be executed *only* in a "public place" and not in Bentley's home, *see* 975 P.2d at 786, and here the search warrant could be executed against Ramirez's car *only* if that car was at Ramirez's home. In both cases, the officers used a ruse in order to execute the warrants in a manner that fulfilled the additional condition that was *not* required by the Fourth Amendment. In *Bentley*, the officers came to Bentley's home, revealed themselves as officers, and then falsely stated that they needed him to come outside to address his car registration and a possible incident in which persons had been "rummaging in his vehicle." *Id*. Under the flawed reasoning adopted by the majority here, such a "betray[al]" of the suspect's "trust in law enforcement in order to conduct searches and seizures beyond what [the officers] were lawfully authorized to do" would mean that the "Fourth Amendment interest is near its zenith" and should have led to suppression. *See* Maj. Opin. at 24. But the Idaho Supreme Court reached the directly opposite conclusion, correctly holding that, because the arrest "was made for the purpose set forth in the arrest warrant," the "use of subterfuge" to comply with the warrant's manner-of-execution limitation did "not violate Bentley's rights under the Fourth Amendment to the United States Constitution." 975 P.2d at 788. So too here.

The majority's error is further confirmed by this court's decision in *United States v. Phillips*, 497 F.2d 1131 (9th Cir. 1974). In *Phillips*, the officers pretended to be investigating a burglary of an office building, but their real purpose was

to gain access to the building in order to make a warrantless arrest of Phillips, whom they had probable cause to suspect was involved in drug dealing. *Id*. at 1133–34. We held that, because there was *no probable cause* to believe that Phillips was in the building at the time, the Fourth Amendment would not allow the officers to enter "absent consent." *Id*. at 1135–36. And because the consent had been obtained by misrepresenting their official investigative purpose, the consent was invalid. *Id*. at 1135 n.4; *see also Bosse*, 898 F.2d at 115 (citing footnote four of *Phillips*). We indicated, however, that if there *had* been probable cause to believe that Phillips was in the building, a ruse would have been permissible to effectuate what would then have been a lawful arrest. As we explained, "[a]n agent must have probable cause to believe that the person he is attempting to arrest, with or without a warrant, is in a particular building at the time in question *before that agent can legitimately enter the building by ruse* or any other means." *Phillips*, 497 F.2d at 1136 (emphasis added).

The majority nonetheless contends that the agents' actions were unreasonable because the intrusion into Ramirez's Fourth Amendment interests was significant, whereas there was "*no* governmental interest justifying the ruse here." *See* Maj. Opin. at 22. The majority is wrong on all counts. By issuing a warrant expressly authorizing a search of Ramirez's car for devices containing child pornography, a "neutral and detached magistrate" had *already* "authorized a substantial invasion of the privacy" of that car's owner. *Summers*, 452 U.S. at 701. Because any residual interest Ramirez might have had in avoiding that authorized search was quite limited (if not non-existent), the agents' use of trickery in carrying out that search imposed, at most, an insubstantial marginal intrusion on Ramirez's Fourth Amendment interests. By contrast, the agents here

had a substantial interest in ensuring that the warrant was effectively executed under circumstances that maximized their control over the places and things to be searched. In particular, given that—as the warrant application explained—there was a substantial likelihood that the sought-for devices would be located in Ramirez's car, the agents had a legitimate interest in carrying out the search while the car was at the residence. And, as the agents noted, having Ramirez be present at the residence would give them the opportunity to see whether he would agree to speak with them. The ruse accomplished all of these legitimate objectives, thereby easily justifying any limited marginal intrusion on Ramirez's Fourth Amendment interests. *See Alverez-Tejeda*, 491 F.3d at 1016 (in determining "reasonableness," the question is whether "the importance of the governmental interests alleged to justify the intrusion" outweighs "the nature and quality of the intrusion on the individual's Fourth Amendment interests") (citation and internal quotation marks omitted).

Finally, the majority raises the specter that, absent its novel rule, law enforcement agents could use a ruse to bring almost anything within the literal scope of a warrant "so long as they could trick a resident into bringing those items to the home to be searched before the warrant was executed." *See* Maj. Opin. at 20. This concern is misplaced. I agree that this would have been a very different case if the agents had used a ruse to bring within the literal terms of the warrant some wholly extraneous object (*e.g.*, Ramirez's *office* computer) that was not within the contemplation of the warrant or as to which no showing of probable cause to search had been made. But that is not what happened. Here, the agents merely used a ruse to obtain access to a vehicle that already *was* "otherwise . . . []available" to them, because the warrant specifically gave them "legal authority to reach"

that particular item. *Alverez-Tejeda*, 491 F.3d at 1017. Under well-settled law, this use of a ruse in executing a search warrant that specifically covered Ramirez's car was not unreasonable under the Fourth Amendment.

Here, the ruse was reasonable because it merely allowed the agents to accomplish the very search of Ramirez's car that the warrant application specifically contemplated and that the warrant expressly permitted, and the ruse allowed the agents to do so in a manner that preserved their effective control over the situation. Nothing in our cases supports the majority's contrary holding, which breaks new ground in imposing unreasonable and unwarranted limitations under the guise of the Fourth Amendment.[2]

## II

I also dissent from the majority's holding that Ramirez's confession should have been suppressed as the fruits of an unlawful seizure of Ramirez.[3] And although the majority does not reach Ramirez's Fifth Amendment argument, *see*

---

[2] Even if I agreed with the majority that the manner in which the agents executed the warrant was unreasonable, it is not clear that the exclusionary rule may properly be invoked where, as here, the alleged violation of the Fourth Amendment relates only to the *manner* in which the very thing specified in the search warrant has been searched or seized. *Cf.*, *e.g.*, *Hudson v. Michigan*, 547 U.S. 586, 599 (2006) (declining to apply the exclusionary rule to violations of the Fourth Amendment's knock-and-announce requirement). But since the parties have not raised this point, I do not address it.

[3] For purposes of determining what "fruits" (if any) should be suppressed, the relevant Fourth Amendment violation can only be the "seizures" that the ruse made possible, and not the ruse itself. *See* U.S. CONST. AMEND. IV (securing right "against unreasonable searches and seizures").

Maj. Opin. at 31; *see infra* note 8, I agree with the district court's conclusion that suppression is not warranted on that basis either.

## A

Ramirez was unquestionably seized during the brief period of time that he was frisked upon his arrival at the house. He contends that the ruse thus *did* have the effect of giving the officers legal authority to seize Ramirez that they otherwise lacked and that the seizure therefore was unlawfully procured by the ruse. In my view, this argument does not support suppression of any evidence.

Because the agents had no warrant for Ramirez's arrest, their initial seizure of Ramirez (unlike the search of the car) cannot be justified on the grounds that the ruse merely executed the express authority conferred by a warrant. As the majority notes, the Government appeared to suggest at oral argument that the search of Ramirez's person upon arrival at the house was justified on the theory that *Summers* allows such a search during the execution of a warrant. *See* Maj. Opin. at 18; *see also Summers*, 452 U.S. at 702–03 (officers executing a search warrant may briefly detain persons present at the scene). Even assuming that this would be an instance in which the use of a ruse had improperly allowed the Government to acquire search authority it otherwise lacked,[4] there is ultimately no physical evidence

[4] The assumption is questionable, because the agents arguably had reasonable suspicion to conduct a *Terry* stop of Ramirez wherever they may have encountered him. *See United States v. Grigg*, 498 F.3d 1070, 1075 (9th Cir. 2007) (noting that under *United States v. Hensley*, 469 U.S. 221, 229 (1985), *Terry* stops for completed felonies are generally permissible). The Government, however, has not relied on a *Terry*-stop theory, and I therefore do not address the point further.

to suppress as a result of that brief frisk, because the cell phone and other items that the agents found on Ramirez's person during the pat-down (which were returned to him before the completion of the search of the house) had no evidentiary value vis-à-vis Ramirez's child-pornography charges.

Ramirez's confession is likewise not subject to suppression on the grounds that it was the fruit of an unlawful seizure. Even assuming *arguendo* that the brief frisk of Ramirez was unlawful, *but see supra* note 4, his subsequent inculpatory statements were not the tainted fruit of that seizure, because the minimal and fleeting intrusion occasioned by the momentary frisk of Ramirez has no causal connection to his subsequent confession. This is not, for example, a case in which the frisk itself produced incriminating evidence that then led directly to a confession. *Cf. United States v. Foppe*, 993 F.2d 1444, 1448–49 (9th Cir. 1993) (where illegal pat-down led to discovery of dyepack-stained money, which led to confession to bank robbery, the confession was a fruit of the pat-down). Nor is it a case in which Ramirez *remained* seized after the frisk and during his confession, a circumstance that could taint, as a fruit of the seizure, even a voluntary confession. *Cf. United States v. Washington*, 490 F.3d 765, 776–77 (9th Cir. 2007) (consent to search, even if voluntarily given, was tainted by the fact that it was given "*while* Washington was illegally seized" (emphasis added)). On this record, the only way in which the frisk could be said to be causally linked to the subsequent confession would be if the frisk affected Ramirez's free will in deciding to speak with the officers and ultimately to make the statements that he did. But as the district court noted, after the brief "force" that was used in the "quick pat-down," there is "no indication at all" that Ramirez's willingness to speak "was forced, that there was pressure put on him, [or]

that there . . . was force shown." And, for the reasons I explain below, the district court correctly held that Ramirez was not seized or in custody when his confession was voluntarily given. *See infra* at 47–49. In the circumstances of this case, there simply is no basis for concluding that the confession was a fruit of the initial momentary pat-down.

As noted, the result might have been different had Ramirez remained seized after the frisk,[5] and indeed the majority suggests (but does not hold) that that was the case here. *See* Maj. Opin. at 29 n.7. I disagree. Under the totality of the circumstances, a reasonable innocent person in Ramirez's situation would have felt free to leave the agents

---

[5] As *Washington* illustrates, the fact that an unlawful seizure continues, and that the suspect's consent was given *during* such a seizure, is certainly relevant in determining whether the consent is a fruit of the illegal seizure under *Brown v. Illinois*, 422 U.S. 590 (1975). *See* Maj. Opin. at 29. As the Supreme Court has observed, in cases such as *Brown*, "the wrong consists of the police's having control of the defendant's person *at the time he made the challenged statement*. In these cases, the challenged evidence—*i.e.*, the post arrest confession— is unquestionably the product of the illegal governmental activity—*i.e.*, the *wrongful detention*." *New York v. Harris*, 495 U.S. 14, 19 (1990) (simplified) (emphasis added); *see also id.* (noting that whether the confession is a "product" of the Fourth Amendment violation is a "threshold" question in assessing whether other factors attenuate the connection to the illegality). I agree, of course, that there is no requirement that a suspect *remain* seized in order to show a link between an illegal seizure and a subsequent confession. There are alternative ways in which, in a given case, such a connection might be shown. *See*, *e.g.*, *United States v. Bocharnikov*, 966 F.3d 1000, 1004–05 (9th Cir. 2020) (where a prior confession had been obtained during an unlawful seizure, the suspect's subsequent confession given eight months later was a fruit of that prior seizure, inasmuch as the subsequent confession was given in response to the agent's opening comment that he was "follow[ing] up" on the prior statements). No such alternative causal link is apparent on the facts of this case.

(either by leaving the property or by joining Ramirez's mother and, after she later arrived, Ramirez's girlfriend, both of whom were in the living room). *See United States v. Redlightning*, 624 F.3d 1090, 1102–03 (9th Cir. 2010) (whether "a reasonable person would have believed that he was not free to leave" is "an objective test, applied from the viewpoint of an innocent person" (simplified)).

After the brief pat-down, Ramirez was not placed in handcuffs, was not told that he was under arrest, and was not otherwise given any indication that he was still seized. The lead agent walked with Ramirez back to the house and asked Ramirez if there was a place where they could talk, and Ramirez chose the master bedroom. Only two agents were present during the interview, and although they were armed, no guns were drawn. No threats were made to Ramirez, no force was used against him, the door was not blocked, and he was never ordered to answer the questions. The interview lasted less than one hour. Although Ramirez testified that initially he was not affirmatively told that he was free to leave, he also testified that, toward the middle of the interview, he was specifically told that he was not under arrest.[6] Given the lack of any use or show of force, the lack of any direct commands, the fact that Ramirez was at his own home and chose the room, and the relatively brief length of the interview, a reasonable person would have felt free to leave the officers. *See Redlightning*, 624 F.3d at 1101, 1103–04 (no seizure of defendant even though he was frisked, brought from his home to a local FBI office filled

---

[6] The agent testified that, in fact, he told Ramirez at the outset of the interview that he was not under arrest. The district court, in its ruling, did not make a specific factual finding as to which witness was correct on this particular point. But even under Ramirez's version, I would conclude that he was not seized.

with FBI agents, strapped to a polygraph machine, and informed that he was under investigation for murder).

In stating that Ramirez "makes a compelling argument" for a contrary conclusion, the majority cites *Florida v. Royer*, 460 U.S. 491, 501, 503 (1983) (plurality), and the fact that Ramirez's phone, wallet, and keys (which had been temporarily seized during the pat-down) were not returned to him until after the interview was completed. *See* Maj. Opin. at 29 n.7. But unlike *Royer*, where the agents retained the suspect's airline ticket *at the airport*, retrieved his checked luggage, and led him to a "large closet," 460 U.S. at 501–03, Ramirez was not questioned in a transit place that one temporarily visits for the express purpose of boarding a carrier to leave—he was at *home*, in a room of his choosing, and with his mother and girlfriend close by (and at least one of whom had *her* car at the house). Likewise, in *United States v. Chan-Jimenez*, 125 F.3d 1324 (9th Cir. 1997), the officer retained the suspect's driver's license and vehicle registration while the suspect and the officer were on "the side of the road" in "the Arizona desert," thereby creating conditions in which a reasonable person obviously "would not have felt free to leave or to ignore the officer's presence and go about his business." *Id.* at 1325–26. Ramirez's situation at his own home bears no relation to these cases in which travelers in transit were directly prevented from continuing those travels, and these cases therefore do not support the conclusion that Ramirez was seized while he was in his own home.

Because Ramirez was no longer seized after the pat-down was completed, his situation is unlike the one in *United States v. Johnson*, 626 F.2d 753 (9th Cir. 1980), upon which the majority relies. *See* Maj. Opin. at 27–28. There, the officers illegally arrested Johnson at the outset of the

encounter at his home, and he remained under arrest during the ensuing interview there, in which he made incriminating statements.**[7]**   *Johnson*, 626 F.2d at 755–57.   Those statements were obviously the fruit of the unlawful arrest, as was Johnson's subsequent confession at the police station, in which he reaffirmed his earlier inculpatory statements.  *Id*. at 758–59.  Here, unlike in *Johnson*, Ramirez was not under arrest (or even seized) during his interview, and his voluntary confession was not the fruit of any Fourth Amendment violation.  His confession therefore was not subject to suppression based on that Amendment.

## B

For largely the same reasons, I likewise agree with the district court that Ramirez was not in custody for Fifth Amendment purposes and that *Miranda* warnings therefore were not required.**[8]**

---

**[7]** To the extent that the majority suggests that *Johnson* did not consider the continuing nature of Johnson's arrest in assessing whether his statements were the fruit of that unlawful arrest, *see* Maj. Opin. at 28, that suggestion finds no support in our decision in that case.  In *Johnson*, we noted that, after the initial illegal arrest at the doorway of Johnson's home, "it [was] extremely doubtful that Johnson would have believed that he was free to leave *at any time* or to request the officers to leave *after the initial encounter*.   A reasonable person, under *those* circumstances, would have thought *that he was under arrest*."  626 F.2d at 756 (emphasis added).  The statement was tainted because it "was made within ten minutes after the entry and . . . '[n]o intervening events broke the connection between petitioner's *illegal detention* and the confession.'"  *Id*. at 758–59 (emphasis added) (citation omitted).

**[8]** Ramirez does not contend that his statement was involuntary under the Fifth Amendment, but *only* that it was not Mirandized.  The majority expressly declines to reach the issue of voluntariness, see Maj. Opin. at 29 n.7, and it likewise does not address Ramirez's *Miranda* argument.

In contending otherwise, Ramirez relies principally on *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008). *Craighead*, however, bears no resemblance to this case. In *Craighead*, the interview took place at the suspect's home, but the home was on a military base, and the suspect knew that a superior from his Air Force unit and three different law enforcement agencies were all present at the house during the execution of a search warrant. *Id*. at 1078–79; *see also United States v. Quackenbush*, 728 F. App'x 777, 778 (9th Cir. 2018) (distinguishing *Craighead* based in part on its "military undertone"). In sharp contrast to this case, the agents in *Craighead* chose the venue for the interview— picking what we characterized as the "dark recess" of an isolated storage room at the back of the house—and one of the officers physically leaned with his back to the door, thus blocking with his body the only way out. 539 F.3d at 1086– 89; *see also id*. at 1088 (specifically distinguishing Craighead's situation from that of someone interviewed "in a suspect's kitchen, living room, or *bedroom*" (emphasis added)). And, again in contrast to this case, many of the agents "unholstered their firearms in Craighead's presence." *Id*. at 1085. Given these significant differences, the circumstances of Ramirez's interview did not present a situation like *Craighead* in which "there was simply nowhere for him to go." *Id*. at 1089.

Because Ramirez was not in custody, there was no *Miranda* violation, and the motion to suppress was properly denied.

## III

In view of its reversal of the denial of Ramirez's motion to suppress, the majority has no occasion to address Ramirez's challenges to his sentence. *See* Maj. Opin. at 31.

However, since I would affirm his conviction, I will briefly address these issues.[9]

Ramirez challenges the constitutionality of one of the conditions of his supervised release (restricting his ability to view adult pornography), but we recently rejected similar constitutional challenges to a substantively identical condition imposed by the same district judge. *United States v. Ochoa*, 932 F.3d 866, 869–71 (9th Cir. 2019). I would likewise reject Ramirez's claims that the district court failed to provide an adequate explanation for imposing the condition and that the condition is substantively unreasonable. *See United States v. Gnirke*, 775 F.3d 1155, 1159 (9th Cir. 2015) (no procedural error where district court explained that condition was warranted because of the connection between adult pornography and child pornography).

\*        \*        \*

For the foregoing reasons, I would affirm the judgment in full. I respectfully dissent.

---

[9] As the majority recognizes, Ramirez's challenge to the restitution order is moot, because the restitution has already been fully paid. *See* Maj. Opin. at 31. On that score, I would grant the Government's motion to supplement the record with respect to pages 4, 8, and 9 of the Government's submission, which document the payment and demonstrate mootness. I would otherwise deny the motion.